

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-05-303-CR

ALLEN JOHN ALDRICH                                    APPELLANT

V.

THE STATE OF TEXAS                                          STATE

------------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

## OPINION ON REHEARING

------------

Following the issuance of our original opinion, appellant Allen John Aldrich filed a motion for rehearing requesting that we reinstate the State's original plea bargain offer. We deny Aldrich's motion for rehearing, but we withdraw our opinion and judgment issued November 26, 2008 and substitute the following in their place to explain and clarify why reinstatement the State's plea bargain offer is not proper.

# I. INTRODUCTION

The primary issue we address in this appeal is whether appellant Allen John Aldrich was denied his constitutional right to effective assistance of counsel. Because we hold that the record before us demonstrates that he was, we reverse the trial court's judgment and remand for a new trial.

# II. FACTUAL BACKGROUND

Aldrich was charged with intoxication manslaughter. The evidence showed that at around 8:30 p.m. on April 8, 2004, at the intersection of North Colony and Ragan in The Colony, a pickup truck driven by Aldrich struck Kimberly Hudson, who was crossing the intersection crosswalk in a motorized wheelchair, accompanied by her husband. Kimberly was taken to Parkland Hospital, where she later died.

Shortly after Officer Chad Springer and Sergeant Bill Hall arrived at the accident scene, Aldrich's wife, Danielle, told Sergeant Hall that she and Aldrich were in the vehicle that had struck the woman in the wheelchair. At first, Aldrich denied that he had been driving the pickup, but he later admitted to Sergeant Hall that in fact he, not Danielle, had been driving.

Sergeant Hall detected the odor of alcohol on Aldrich's breath, so he asked Officer James Slack to conduct field sobriety tests. Officer Slack also noticed the smell of alcohol on Aldrich's breath, although Aldrich denied having

2

consumed any alcohol.  The field sobriety tests were conducted approximately thirty to forty-five minutes after the accident.  Aldrich's performance on the horizontal gaze nystagmus and walk-and-turn tests indicated intoxication; his performance on the one-legged-stand test did not.  After observing Aldrich's performance on the field sobriety tests, Officer Slack again asked Aldrich if he had been drinking.  According to Officer Slack, this time Aldrich admitted that he had consumed three twelve-ounce beers between 6:30 and 7:00 p.m. that evening but had lied earlier because he was scared.[1]

Officer Slack reported the results of the field sobriety tests to Sergeant Hall, who asked Aldrich if he would give a blood sample.  Aldrich said yes.  Once at the hospital, however, Aldrich retracted his consent.  Sergeant Hall then ordered that a blood sample be taken because Aldrich had alcohol on his breath, had failed two of the field sobriety tests, and had initially lied about driving and because any alcohol in his blood would not be there by morning.  A nurse drew a blood sample between 10:30 and 11:00 p.m., more than two hours after the accident.  The blood sample contained 0.07 grams of alcohol per 100 milliliters of blood.  The State elicited retrograde extrapolation expert testimony that a 0.07 result at 11:00 p.m. meant that Aldrich's blood alcohol

---

[1] Aldrich testified on his own behalf and denied making this statement to Officer Slack.

3

level at 8:30 p.m. would have been between 0.1 and 0.12. A drug screen performed on Aldrich's blood sample did not reveal the presence of any drugs.

According to Aldrich, he drank three beers while he played frisbee golf between 2:30 p.m. and 6:30 p.m. the day of the accident. Four individuals, who were Aldrich's neighbors and friends, testified that they had seen or spoken with Aldrich at various times throughout the day and evening prior to the 8:30 p.m. accident and expressed their opinions that Aldrich did not appear intoxicated or to have lost the normal use of his mental or physical faculties. Aldrich told Sergeant Hall at the scene that he did not see the Hudsons because he was blinded by the headlights of oncoming traffic.

A jury convicted Aldrich of intoxication manslaughter, and the trial court assessed his punishment, enhanced by a prior felony conviction for driving while intoxicated, at sixty-two years' confinement. This appeal followed.

### III. LEGAL SUFFICIENCY OF THE EVIDENCE

In his seventh point, Aldrich claims that the evidence is legally insufficient to support his conviction. In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*,

4

235 S.W.3d 772, 778 (Tex. Crim. App. 2007). A successful legal sufficiency challenge will result in the rendition of an acquittal by the reviewing court. *Tibbs v. Florida*, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2218 (1982). Accordingly, we address legal sufficiency rendition points before we address remand points. *See Nickerson v. State*, 69 S.W.3d 661, 668 (Tex. App.—Waco 2002, pet. ref'd).

The statutory elements of intoxication manslaughter, as modified by the particular allegations in the indictment at issue, are as follows:

(1) Aldrich

(2) operated a motor vehicle

(3) in a public place

(4) while intoxicated by not having the normal use of his mental and physical faculties by reason of the introduction of alcohol into his body

(5) and as a result of the intoxication, caused the death of an individual, namely: Kimberly Sue Hudson

(6) through accident or mistake, to-wit: by failing to yield the right of way, by failing to maintain a proper lookout, and by failing to avoid a collision between his vehicle and Kimberly Sue Hudson, a pedestrian.

*See* Tex. Penal Code Ann. § 49.08 (Vernon Supp. 2008); *see Auldridge v. State*, 228 S.W.3d 258, 260 (Tex. App.—Fort Worth 2007, pet. ref'd) (setting forth elements of intoxication manslaughter).

5

Aldrich testified that he was driving his truck in a public place, that he struck Kimberly Sue Hudson as she maneuvered her motorized wheelchair in a crosswalk, and that he had consumed three twelve-ounce beers earlier that day. Based on Aldrich's blood alcohol level after the accident, the State's retrograde extrapolation experts testified that Aldrich's blood alcohol level at the time of the accident would have been between 0.1 and 0.12. Numerous witnesses testified that when the accident occurred, it was dusk but not dark; that the street where the accident occurred was well lit; and that the crosswalk was clearly marked and visible. Thus, applying the legal sufficiency standard of review, that is, viewing all of the evidence in the light most favorable to the prosecution, we hold that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. We overrule Aldrich's seventh point.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

In his first point, Aldrich complains that he was denied his constitutional right to effective assistance of counsel because retained counsel's performance was so deficient that no reasonable trial strategy could justify it and because his retained attorney's outrageous conduct was so serious that it undermined the proper functioning of the adversarial process, deprived him of a fair trial,

6

and prejudiced and harmed him. Aldrich raises and presents thirteen categories of alleged ineffective acts by his counsel during trial, including that he "failed to properly interview witnesses, review evidence, and investigate"; "failed to request that the trial court appoint necessary experts despite Appellant's indigency"; failed to file proper and timely motions; misunderstood and misapplied the law; exhibited general incompetence stemming from problems associated with either mental or physical infirmity; made inaccurate and incomprehensible statements; alienated the judge and the prosecutor to the detriment of his client and violated the rules of professional responsibility; failed to adequately convey the plea offer; presented harmful evidence with no strategic purpose; presented defensive theories unsupported by the evidence; failed to make proper objections or ask proper questions of witnesses; failed to object to the improper reading of the victim impact statements before punishment was assessed; and failed to offer any evidence or argument at punishment at all. Within each of these thirteen categories, Aldrich points to numerous specific instances of conduct and specific omissions by his trial counsel.

## A. Standard of Review

To establish ineffective assistance of counsel, an appellant must show by a preponderance of the evidence that his counsel's representation fell below the

standard of prevailing professional norms and that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). No distinction exists between the standards of effectiveness for retained counsel and appointed counsel. *Ex parte Briggs*, 187 S.W.3d 458, 469 (Tex. Crim. App. 2005) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S. Ct. 1708, 1716 (1980)).

In evaluating the effectiveness of counsel under the first prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson*, 9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065. Our review of counsel's performance must be highly deferential. *Id*. There is a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance, and the defendant must overcome the presumption. *Id*. And, under normal circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking as to overcome the presumption that counsel's representation was reasonable and professional. *Bone v. State*, 77 S.W.3d

8

828, 833 (Tex. Crim. App. 2002). But in the occasional, rare case, the trial record on direct appeal alone may present the appellate court with sufficient information to conclude that no reasonable trial strategy could justify counsel's conduct because counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects trial counsel's subjective reasons for acting as he did. *Cannon v. State*, 252 S.W.3d 342, 349–50 (Tex. Crim. App. 2008) (reversing conviction based on ineffective assistance of counsel raised on direct appeal in absence of motion for new trial); *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005) (same); *Robinson v. State*, 16 S.W.3d 808, 809–11 (Tex. Crim. App. 2000) (holding failure to file motion for new trial does not procedurally prohibit appellate claim of ineffective assistance of counsel).

Concerning the second *Strickland* prong, in giving meaning to the Sixth Amendment's requirement that an accused have access to effective assistance of counsel, "we must take its purpose—to ensure a fair trial—as the guide." *Strickland*, 466 U.S. at 686, 104 S. Ct. at 2064. The United States Supreme Court has explained the meaning of a fair trial:

> [A] fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding. The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to

9

accord defendants the "ample opportunity to meet the case of the prosecution" to which they are entitled. . . . That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.

*Id.* at 685, 104 S. Ct. at 2063 (citations omitted). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686, 104 S. Ct. at 2064. Prejudice to the applicant from counsel's deficient performance is judged by whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result*. Ex parte Amezquita*, 223 S.W.3d 363, 366 (Tex. Crim. App. 2006). "As the Supreme Court explained, the purpose of the constitutional requirement of effective counsel is to ensure a fair trial." *Id.* (granting habeas relief on ineffective assistance grounds because trial counsel failed to investigate evidence involving the complainant's cell phone and trial counsel's deficient performance so undermined the proper functioning of the adversarial process that the trial could not be relied on as having produced a just result); *Ex parte*

*Briggs*, 187 S.W.3d at 466–67 (granting habeas relief on ineffective assistance of counsel grounds because trial counsel failed to investigate or obtain experts for economic reasons, not as trial strategy); *accord Hofman v. Weber*, 639 N.W.2d 523, 529 (S.D. 2002) (remanding case for new trial after holding that trial counsel's failure to move to suppress confessions was not within the realm of competence required of members of the profession); *Peebles v. State*, 958 S.W.2d 533, 537 (Ark. 1998) (remanding case for new trial after holding that trial counsel's failure to present the victim's inconsistent statements to the jury deprived the defendant of a fair trial).

A failure to make a showing under either prong of the *Strickland* test defeats a claim of ineffective assistance of counsel. *Andrews*, 159 S.W.3d at 101; *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003).

**B.    First Prong of the *Strickland* Analysis**

In this case, Aldrich has alleged thirteen categories of ineffective acts and omissions by his counsel at each stage of the proceedings, from pretrial to punishment.  In sixty pages of his ninety-two-page appellate brief, Aldrich presents and discusses these thirteen categories of errors, making numerous and specific citations to the record detailing the challenged conduct and explaining how the challenged conduct not only fell below the standard of prevailing professional norms but was so outrageous that no competent

attorney would have engaged in it. Consequently, we begin with a detailed review of the record, focusing on the portions of the record cited by Aldrich in connection with the thirteen categories of alleged ineffectiveness.

1. **The Record Concerning Alleged Ineffective Pretrial Conduct: Misunderstanding of the Law, Failure to Adequately Convey Plea Offer, Failure to Investigate, and Failure to Timely Obtain and Disclose Defense Experts**

Many of counsel's alleged pretrial, as well as trial, errors and omissions are based on counsel's legally incorrect interpretation of the United States Supreme Court case of *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555 (1995). From the pretrial phase of the case through the trial of the case, despite repeated correction by both the prosecutor and the trial court, Aldrich's counsel persisted in his legally incorrect assertion that he did not have to do any investigation, any witness interviews, or make any attempt to obtain discovery because the *Kyles* case basically required the State to do all of the investigation in the case and to turn over to Aldrich all reports, statements, and evidence discovered in its investigation.

The *Kyles* issue, which permeated the entire case, first arose when Aldrich's counsel filed a motion that he titled, "Motion For Discovery/Production." The motion states, in pertinent part, that

[i]n K[yl]es v. Whitley 115 Sup. Ct. 1555, although the final majority opinion was 5/4, apparently it was 9/0 for the proposition

that a prosecutor has a non-delegable duty, early on in the prosecutions process, to personally interview all persons who have more than minimal information concerning the case, and to ask such person the type of questions that could reveal information that an attorney would recognize could be exculpatory, (as opposed, let's say, what a policemen might consider exculpatory), and even if the prosecutor doubts the credibility of such information, to immediately give such information to the defense for, among other reasons, the defense may need such information when deciding whether or not to explore the possibility of a trial as opposed to plea bargaining.

The relief Aldrich's counsel requested at the conclusion of this motion was "that the District Attorney be ORDERED to comply with the U.S. Supreme Court mandate set out in Kyles, and that a deadline be set for such compliance."

The reporter's record of the September 9, 2004 pretrial hearing on Aldrich's motion for discovery/production begins with Aldrich's counsel stating,

I have talked to - - I forget Jim's last name, but it's the guy who is going to be - - the attorney who is going to be prosecuting this case - - at one time before the first hearing on the case and asked him if he intended to follow the mandates of the Supreme Court of the United States in Kyles versus Whitley. And he said he was busy and tied up and he'd talk to me later about it.

. . . .

I want a court order that gives him a deadline, ***because I can never be ready in this case until he does what he's supposed to do.***

. . . .

13

I want an order from this court that says that he must do - - he must talk to these witnesses, he must ask them the kind of questions that the Supreme Court says he has to ask them, and he has to reveal to us anything that could even lead to exculpatory evidence, because he's saying he's not going to do it.

. . . .

I said, well, at least call the police and ask them to talk to us, because we have talked to them and they say they won't talk to us unless you say it's okay.  He says, no, he wouldn't do that.

THE COURT: I don't think that you have any authority that says that he [the prosecutor] has to tell the police officers to talk to you.

DEFENSE COUNSEL: That's true.  ***He has the obligation under Kyles versus Whitley to do it himself and to report back to us if there's anything exculpatory***.

Finally, the prosecutor responded as follows:

What the Kyles case holds is that there is a distinction between the State's nondisclosure of known Brady material versus going out and investigating to uncover Brady material.  And the State acknowledges that it does have a duty to obtain exculpatory information, mitigating, or impeachment evidence that would otherwise be unavailable to the defense, but the case - - that case, and on its facts, turned upon the bad-faith nondisclosure of Brady material.
     In this case, as we would in any other case, Your Honor, we intend to comply with the rules of evidence and the case law to turn over any exculpatory, mitigating, as well as impeachment evidence.  Now, that may not be on [defense counsel's] time frame in terms of ordering the State to go out and interview witnesses or police officers, but it will be done timely and appropriately in this case.

14

DEFENSE COUNSEL: I'm waiting for him to say when that might be, Your Honor, **because I'm going to need at least 90 days after I have this information to get ready for trial**.

THE COURT: I don't know that he has to say when they're going to do it.

DEFENSE COUNSEL: Well, the Supreme Court says that they should have done it already. [Emphasis added.]

After the hearing, the trial court signed a September 21, 2004 order requiring the State to timely disclose at the earliest feasible opportunity the existence of evidence tending to negate the guilt of the accused or mitigate the offense charged or reduce the punishment of the accused.

At a subsequent pretrial hearing, Aldrich's defense counsel again argued that the State was violating *Kyles*. Despite the prosecutor's representation that the State would be proving intoxication through the introduction of alcohol (as opposed to drugs) into Aldrich's body, defense counsel argued that the prosecutor should have obtained the results of a drug screen performed on Aldrich's blood and should have forwarded it to defense counsel. Finally, after a lengthy attempt to explain to defense counsel that, because the State was proceeding under the theory of intoxication by alcohol, the results of any drug screen performed on Aldrich's blood sample would not be exculpatory and would not be subject to production under the order signed by the trial court, the trial court explicitly told defense counsel that the case was not set for trial yet

15

and that, if in fact he wanted the results of the drug screen records, he could subpoena them. Counsel responded,

> Well, when it's set for trial, then I guess I could use a trial subpoena, but where am I going to – we're going to subpoena him just to come into the –you know he's got to be subpoenaed to trial.
>
> THE COURT: You can subpoena records, though.
>
> DEFENSE COUNSEL: Just tell them to come up here on any day I choose and hand them to him? The subpoenas say[] they have a right to produce them in court. They don't have to show me diddly squat.
>
> THE COURT: No, sir. You can subpoena records without that. You don't have to have a person present to produce them to you.
>
> . . . .
>
> DEFENSE COUNSEL: And the subpoena usually says you're to be at – with those records on such and such a date. They don't have to give them to me at all. They are just required to be there.
>
> THE COURT: No, sir. I think you're completely mistaken. You can get those records and then file them as a business record and those people don't even have to be here in order for them to be admissible into evidence.

Despite this instruction from the court, when the hearing concluded some thirty pages later in the record, the trial court again told defense counsel, "Sir, you can get that. All you have to do is file a subpoena down at DPS lab and they will send that to you." Defense counsel responded, "All right. I shall call them and report back to you, Your Honor."

16

Finally, at the third pretrial hearing in this case, when the trial court called the hearing, defense counsel immediately began arguing again that the State had failed to comply with *Kyles*:

> A district attorney simply cannot wait nine months out of a year and say, Well, I haven't talked— last time, you remember, he said, I haven't talked to any witness in this case since it began. And so that was a good thing. But he cannot just let the State use the evidence and develop theories of the case and experiments for nine months or ten months or 11 months, however long it's going to be until he talks to them, and then when he gets all this exculpatory information, ***thinks that I'm going to be able to play catch up in 60 days or something. That's always been my problem before, as I said***.
>
>     . . . .
>
> [A]nd I told him, [the prosecutor] on numerous -- I want that -- I want you to obey Kyles vs. Whitley.

Again, the trial court attempted to explain to defense counsel that there were motions he could file and ways he could obtain nonexculpatory evidence. The following exchange occurred:

> THE COURT: And all that [defense counsel's prior motion for discovery/production] asks for is exculpatory information. You have not asked for anything else. You haven't asked for any tests, any, you know, how things were tested, under what conditions they were tested, things of that nature. Now, you said your client passed the blood test?
>
> DEFENSE COUNSEL: Yes, he certainly did.
>
> THE COURT: All right. Again, don't you think a motion for discovery might be proper for you to get what you need?

17

DEFENSE COUNSEL: Well, *I think after I get the exculpatory information*, it certainly is something --

THE COURT: But, if, in fact–let's suppose that there's no exculpatory information.  How can you get that? [Emphasis added.]

The hearing concluded, and defense counsel again still had not performed any investigation or discovery; he was waiting on the State to comply with his legally incorrect interpretation of *Kyles*.

At yet another pretrial hearing, defense counsel still focused on *Kyles*. Defense counsel claimed he wanted to call himself to the stand to testify because

> [w]ell, the only person that's really in a position to testify to these facts about the lack of the court enforcing [the prior order requiring the State to timely produce exculpatory evidence] about that he was ordered way back last year to give exculpatory information, and the fact that you ordered him to give it on the 21st of January—I have the transcripts—would be the lawyer.  The only one who knows about a conversation with [the prosecutor].

The trial court permitted defense counsel to offer his own testimony as a bill, and defense counsel again focused on the State's purported lack of compliance with *Kyles*.  He testified:

> The Court will remember that after you told him to do it, two pages later in the transcript you ordered him to turn over exculpatory information then.  And, of course, the only way that the D.A.'s find out about exculpatory information is to ask the witnesses as the Supreme Court began in Brady and later in something and later in the Kyles case that I've already given that cite to, but he would have to talk to these people.

18

Also in that hearing the Court said let's get to the heart of the matter, [the prosecutor], you're not going to go on the, per se, 08 sign of intoxication. You're going to only go on the 07; am I correct? To which [the prosecutor] said, Absolutely, Your Honor, only the 07. So that was an indication to us that we were not going to have to worry about drawing down more money out of my retirement to get an expert witness on what he has now done. So we were told that at your direct questions, his saying absolutely that we weren't going to have an attempt at an 08, per se. Now --

THE COURT: No, I don't remember it that way.

. . . .

I think what [the prosecutor] meant when he said they were going on the .07 is that they were not going to do anything regarding any drugs or anything, just the alcohol part of it; is that not correct?

THE PROSECUTOR: Yes, Your Honor.

On the day Aldrich's case was originally called for trial, defense counsel testified on the record in a narrative form spanning eight pages in the reporter's record. Portions of defense counsel's testimony include the following:

I warned the Court that they would exhaust our resources, exhaust our money and at the last minute come up and do this. . . . Now, he didn't say I'm going on the alcohol. He said, Everybody's saying 07 throughout this transcript that I have. So I didn't draw out more money out of my retirement to get somebody to show -- to oppose the extrapolation part of it. . . . I called the police and I said, Look, Captain Chris Chandler is telling us the police are going to give us nothing, but the Court ordered the District Attorney to tell the people that it was okay to talk to us and we set up the appointment. They said, Gee, [defense counsel], that's not the message I got. And I said, Well, Mr. Chandler, what is the message you got? He said that he got it from a lady D.A. who said

19

to him, You don't have to talk to them. . . . So then I called back [the prosecutor] and I said, Well, you've proven to me that there is no–I'll be honest with you–there's no court in Denton County that's going to enforce [the September 21, 2004] order. You can just remain in culpable ignorance, as long as you don't ask, then they're not going to make you find out and tell me. So I guess that, rather than the right way that I've always done it, find out the exculpatory stuff first and look at the D.A.'s file, I guess I'm just going to have to look at your file first because I'm not going to get anything exculpatory. [Defense counsel] said, now, I'm so startled about this answer, but this is really not a quote, but it is doggone near. [Defense counsel], you've hurt my feelings in this case by saying bad things about me, so for you only, your client is going to suffer. I'm going to close the open-file policy that the District Attorney established in this county, and you're not going to get it. . . . We feel that that should have been given by the – DWI videotape that we should have been given a copy, I believe it's 20 days. I believe the law says they got to give us a copy of it 20 days before trial.

THE COURT: If they're going to use it.

DEFENSE COUNSEL: No. Give it to us 20 days before trial.

THE COURT: If they're going to use it and it contains exculpatory information. If it doesn't show anything, then they don't have to give it to you.

And, also, did you file a motion for discovery?

DEFENSE COUNSEL: Well–

THE COURT: Is that a yes or no?

DEFENSE COUNSEL: To discover exculpatory information, yes, we did.

    . . . .

20

THE COURT: Did you file a motion for discovery of any scientific tests, any type of videotapes, etcetera, etcetera?

DEFENSE COUNSEL: Well, since it wasn't until Tuesday of last week –

THE COURT: My question is, sir, did you file a motion for discovery?

DEFENSE COUNSEL: Yes.  I think that you would consider my motion filed and ruled on [on September 21, 2004] a motion for discovery, yes.

. . . .

THE COURT: Well, I'm looking at this motion for discovery [that was ruled on on September 21, 2004].

DEFENSE COUNSEL: Yeah.

THE COURT: And the only thing that I see in here is that you're asking for exculpatory information.  You're not asking for anything specific, just anything that's exculpatory.

DEFENSE COUNSEL: Right.

. . . .

DEFENSE COUNSEL: Now Judge, just so my position is clear, there's no appellate court that's **ever said that exculpatory is what the D.A. has.  What they say is that exculpatory is any information possessed by paramedics, by police department, by all the witnesses that are considered State witnesses because their knowledge is imputed to the D.A.**  So in order to be exculpatory, that includes things that would lead to exculpatory, they have to ask.  But what gets changed here is you keep saying that your vision is, is just what they have.  They don't have to ask.  So no wonder [the prosecutor] hearing that, doesn't ask.  Now, they can't say that we admitted –State can't say we made a good faith effort

21

to dig out all this exculpatory information so we could turn it over. That's exactly what happened in Kyles. If we don't find out, we don't have to disclose it, and that's re-enforced by the Court saying they only have to turn over what they have. That's not what the appellate courts say at all.

. . . .

THE COURT: Okay. You're talking about witnesses? Have you filed a motion for a witness list? I mean, for trial hearing. Have you done that?

DEFENSE COUNSEL: Have I done it?

THE COURT: Yes. I don't see it in the file.

DEFENSE COUNSEL: *I didn't know the defense was required to do that.*

THE COURT: You think that the prosecution has to turn over a witness list without a proper motion?

DEFENSE COUNSEL: *No. It's truthful, I'm not sure. I'm not familiar with all the local rules.*

THE COURT: I don't think it's a local rule. [Emphasis added.]

After defense counsel concluded his narrative testimony, the trial court permitted the prosecutor to cross-examine defense counsel. The prosecutor established that defense counsel had not filed a motion for rule 404b notice, had not filed any kind of discovery motion (other than the one for exculpatory evidence ruled on on September 21, 2004), had not turned over to the State

22

the names of any experts the defense might call, and did not know the law concerning the State's right to amend an indictment.

At the conclusion of this hearing, the prosecutor stated,

Just to put on the record that the State, based on what we heard today from Defense Counsel, is seriously worried about [an] ineffective assistance claim. And we're afraid of going and trying this case because of what Defense Counsel has not done, where he's never filed a 404(b), and I had to send it to him. And when I did, he accused the State of trying to intimidate him. He has never filed any motions, didn't even know when the witness list has to be turned over, didn't even know when we had an absolute right to turn over—I mean to amend the indictment. And the State, based on his testimony, has very serious concerns on trying this whole case again, possibly getting a conviction, and then getting it overturned because of ineffective assistance, when he didn't even file a motion telling us about an expert. And we're afraid that on appeal, that this would be—whatever would happen today, would be overturned because of ineffective assistance. And we just wanted to put that on the record.

The prosecutor later stated,

I have one quick thing to put on the record. I just want for the record to state that the State had made a plea offer, 20, to the Defense and they've never responded. So I just wanted to put that on the record.

DEFENSE COUNSEL: That's not accurate, Your Honor. He told us that the offer of 20 years, the maximum, would have to be taken up by the 16th or he would take our reply to be that we rejected it. I believe that's what your letter said.

THE PROSECUTOR: *Your Honor, he doesn't even know what the sentence is. [Twenty years] is not the maximum.* The maximum here is life. And that shows that he did get—he did get the plea offer.

23

Likewise, the trial judge later commented to Aldrich,

> And what I'm worried about, and I know this might offend [defense counsel], and the jury panel or no one is present.  There are some people present in the court.  That almost per [se], what I see right now is ineffective assistance of counsel.  And I would be worried that if you were tried—and I don't want to try this case twice, and you were convicted, that in all probability, if this case was appealed on ineffective assistance of counsel—and, of course, I don't know what the Court of Appeals would say, but just thinking about what they might say, that in all probability your case would be overturned, and you would have to be tried again in this matter.

Based on concerns for Aldrich's rights, even though a jury panel had been waiting all morning for trial to commence, the State moved for and was granted a continuance of the trial setting.  Defense counsel was specifically told that the granting of the continuance reset the timetables for him to be able to timely file any motions he desired.

Approximately five months later, the trial court set a status conference in the case.  Prior to the status conference, defense counsel sent a letter to the prosecutor and the trial court claiming the following:

> Our courts hold that no matter what my client tells me about the facts in his case, I am compelled to make a thorough investigation of all facets and law of his case before I discuss the idea of expending possibly Mr. Aldrich's entire wealth upon a trial or if we should consider a plea.  No lawyer should be compelled to enter into the trial or plea discussion with his client until he obtains from the prosecutor all the exculpatory information as he is required by Kyles to produce.  The prosecutor is forbidden, as he has bragged about doing in this case, to refrain from even talking to

24

any witnesses for over a year after the occurrence, long after memories have faded.

Especially when clients have little money (Mr. Aldrich is in bankruptcy), his meager resources should be preserved to hire experts, if necessary. The best way, I have found, to prepare for trial is to get from the District Attorney that which Kyles says he <u>must</u> give early in the process. <u>Then</u>, knowing what facts the State's witnesses and the defense agrees upon, to concentrate to develop additional witnesses, expert and fact, to produce testimony favorable to the defense. <u>Only then</u> is the attorney allowed to discuss with a client whether to attempt a plea or proceed to trial.

. . . .

When I explained that [the prosecutor] was attempting to force me to commit what I considered malpractice by forcing my client to choose twenty (20) years or trial **before the case was th[o]roughly investigated by the defense** they did not seem surprised. . . . **The threat of [the prosecutor] to withdraw his twenty (20) year offer on 06 June 2005 if I do not commit malpractice has been conveyed to Mr. Aldrich whom I am proud to say rejects this latest attempt at blackmail.** [Emphasis added.]

A few weeks later, the trial court held the status conference. Despite the intervening four- to five-month time interlude, defense counsel still had not filed any discovery motions, had not filed a motion that a specimen from Aldrich's blood sample be physically turned over to him, and had not requested a witness list from the State nor turned over his witness list to the State. Defense counsel fell back to his standard position, "Well, then the status is that we still haven't been given exculpatory matters by the State." At this point, the trial court instructed defense counsel to sit down and to handwrite a request that

25

a specimen of Aldrich's blood be turned over to him. Defense counsel complied; the handwritten request is contained in the clerk's record. The trial court immediately signed an order granting the request. Defense counsel, upon being informed that the sample was ready for him, failed to pick it up for over a week until the prosecutor called defense counsel and asked why he had not picked up the sample.

Another pretrial hearing was held approximately one month later. Defense counsel, by this time, had filed three motions: one motion for production of evidence favorable to the accused, one motion for reproduction of witness statements or writings used to refresh the recollection of witnesses, and then a regular discovery motion. These three motions are copied from a form book, replete with blanks and brackets for [caption], [attorney signature block], and other case-specific items.

At this hearing, defense counsel indicated that he had obtained his client's blood sample and had it tested and that the results showed a blood alcohol level of .04;[2] the focus of defense counsel's concern at this hearing

---

[2] At trial, Dr. Angela Springfield testified for the State that she was not surprised to learn that the blood alcohol level in the sample had dropped from .07 to .04 during the fourteen months between when the sample was taken and when it was tested by the defense because blood samples lose their alcohol content when the sample is not refrigerated and when the vial containing the sample is opened and closed for retesting.

was the admissibility of his test results because of what defense counsel perceived to be chain of custody issues. The prosecutor explained that defense counsel did not need to worry about establishing the State's chain of custody, he had to establish only his own chain of custody—what he did with the blood sample from when he picked it up until he returned it. Defense counsel stated, "If he says that's what the law is, I'm willing to accept that. All I've got to do is [prove] my one-hour custody and that would be fine." The trial court granted most, if not all, of the relief sought in defense counsel's motions; the prosecutor indicated that most of the items and information sought had already been gratuitously provided to defense counsel.

A final pretrial conference was held on the morning of July 25, 2005, the first day of trial. The trial court had previously ordered the defense to disclose the names and addresses of all defense experts at least twenty days before trial.[3] The week before trial, not twenty days before trial, defense counsel faxed to the State a document titled, "In Response to the State of Texas Request for Information on Expert Witnesses." The response listed a "David

---

[3] At Aldrich's original trial setting, the State objected to having any of Aldrich's experts testifying because the State had not "received any notice at all of any expert being called."

Taylor" as an expert who would testify regarding roadway headlights.[4] No address, phone number, or curriculum vitae was provided for "David Taylor." Nonetheless, the State conducted an internet search and contacted the person it believed was the defense expert, an accident reconstructionist from the Carrollton Police Department. That particular David Taylor said that he had never been contacted by anyone about the case, and defense counsel stated on the day of trial that he intended to call a different David Taylor.[5] The trial court ruled that David Taylor would not be allowed to testify because defense counsel had failed to provide proper or timely notice to the State regarding Taylor. The response also listed Don Ingle as an accident reconstructionist expert. The trial court subsequently ruled, however, that because Ingle's accident reconstructionist experience included only taking one short course thirty years ago, he was not qualified to testify as an accident reconstructionist expert; he did testify as a fact witness.

---

[4] Defense counsel stated that Taylor would testify as an expert and "interpret the Texas law as to the preferred directions of headlights on motor vehicles traveling on public roadways in Texas and how far up the roadway headlights will shine when in the 'down' and not 'bright' mode."

[5] During the on-the-record discussion of whether David Taylor should be permitted to testify, defense counsel asked the trial court, "What did I say that Taylor was?" The trial court responded, "Sorry?" And defense counsel asked, "Would you tell me what [kind of expert] I said Taylor was and refresh my memory?" The trial court did so.

On the morning of trial, defense counsel filed a "Supplement to Defendant's List of Expert Witnesses." The supplement sought to designate a "Richard E. Sullivan" as an illumination expert and attached a report from Sullivan that had been prepared the weekend before trial started on Monday. The report documents the illuminance in the crosswalk at issue, specifically, the limited illuminance provided in the crosswalk near the center of the four-lane street. Defense counsel claimed that he had just decided to call Sullivan as an expert because the State had tardily provided the defense exculpatory information—the fact that Sergeant Bill Hall was the officer to whom Aldrich had stated at the scene that he had been blinded by the lights of oncoming traffic. But the record reflects that the prosecutor had gratuitously provided the names of all the involved officers to defense counsel on January 21, 2005, at a hearing that had occurred six months before trial commenced. The trial court ruled that Sullivan could not testify because this notice was given too late.[6] The trial court explained, "You can bide your time, sir. You've had a year and a half to prepare this case, so you've had ample opportunity. And we were ready to try this case, what, six months ago; and you've had six months more to prepare for it."

---

[6] Defense counsel failed to make an offer of proof regarding either Sullivan's or Taylor's proposed testimony.

29

The trial court did rule, however, that it would permit Max Courtney to testify for the defense. Defense counsel had provided Courtney's curriculum vitae to the State in connection with a motion for continuance that he had filed about a month earlier. The prosecutor indicated, "I know Max Courtney. I don't have any problem at all with Max Courtney. But these other people, Your Honor, the people listed here without—I have—he didn't give us proper notice."

Finally, at some point during the trial, defense counsel subpoenaed Trooper Blair. The prosecutor pointed out, "I thought we had a ruling on that that any of his [Trooper Blair's] testimony was irrelevant because Defense Counsel was going to have him testify to him having an accident, that you can have an accident in the daytime, and since both this Trooper's accident was on a highway in another county, not at this intersection, not in The Colony, not at the exact same time, anything that would have been relevant with his crash has nothing to do with the case in chief." The trial court ultimately permitted Defense Counsel to call Trooper Blair; he testified only that it is possible with different circumstances for a careful driver to nonetheless not see an approaching pedestrian.

30

### a. Misunderstanding of the Law Constituted Deficient Performance

Looking with great deference to defense counsel's perspective at the time, defense counsel's misinterpretation of *Kyles*,[7] his lack of understanding of basic discovery procedures, and his misunderstanding of what legally constitutes exculpatory evidence are amply reflected in the record, and all fall below the objective standard of reasonableness as a matter of law. *Accord Andrews*, 159 S.W.3d at 100 (holding defense counsel's failure to object to the prosecutor's misstatement of the law fell below objective standard of reasonableness as a matter of law); *Ex parte Welch*, 981 S.W.2d 183, 185 (Tex. Crim. App. 1998) (holding defense counsel's misunderstanding of law constituted ineffective assistance of counsel); *accord Ex parte Chandler*, 182 S.W.3d 350, 358 (Tex. Crim. App. 2005) (recognizing that "[i]gnorance of well-defined general laws, statutes and legal propositions is not excusable and such ignorance may lead to a finding of constitutionally deficient assistance of counsel"). Defense counsel was repeatedly told by the trial court that his interpretation of *Kyles* was legally incorrect. Defense counsel nonetheless

---

[7] The State agrees that defense counsel's interpretation of *Kyles* is "somewhat expansive," but it argues that "[n]one of Aldrich's claims in this appeal about his counsel's alleged misunderstanding of the law had any effect on the outcome of the trial that the State can discern."

persisted in his mistaken interpretation of *Kyles* and relied upon his mistaken interpretation—knowing that the trial court disagreed with it—to make the decision to do nothing to prepare Aldrich's case. Defense counsel recognized that he was doing nothing and that he intended to do nothing; he repeatedly claimed on the record that he would need sixty to ninety days to prepare *after* the State completed its investigation and turned over the results of its investigation to him.[8] There is no plausible basis in strategy or tactics for counsel's misunderstanding of *Kyles*, of discovery procedures, or of what constitutes exculpatory evidence. *See Thompson*, 9 S.W.3d at 814. We hold that this conduct satisfies the first prong of the *Strickland* test.

### b. Failure to Adequately Convey Plea Offer Constituted Deficient Performance

Aldrich argues that trial counsel failed to adequately convey the twenty-year plea bargain to him. The record before us contains defense counsel's

---

[8] At one point, defense counsel stated,

> I will need about four months after I get all of the exculpatory information to play catch up. They've had a year. I'm just asking for four months and so the State will know that the sooner they get the exculpatory stuff to me—which is out there, I assure the Court. If they say they don't have it, it's only because they haven't bothered to follow the mandates.

At another place defense counsel explained, "I can never be ready in this case until he does what he's supposed to do."

32

letter rejecting the plea bargain, and it supports Aldrich's position. The letter specifically sets forth defense counsel's belief that it would be unethical and would constitute malpractice for him to even discuss the proposed plea bargain with Aldrich:

> The best way, I have found, to prepare for trial is to get from the District Attorney that which Kyles says he <u>must</u> give early in the process. <u>Then</u>, knowing what facts the State's witnesses and the defense agrees upon, to concentrate to develop additional witnesses, expert and fact, to produce testimony favorable to the defense. <u>Only then</u> is the attorney allowed to discuss with a client whether to attempt a plea or proceed to trial.

The letter characterizes the plea offer as "forcing my client to choose twenty (20) years or trial **before the case was th[o]roughly investigated by the defense**" and is dated a mere two months before trial actually started. [Emphasis added.] Finally, the letter rejects the plea offer, stating, "The threat of [the prosecutor] to withdraw his twenty (20) year offer on 06 June 2005 if I do not commit malpractice has been conveyed to Mr. Aldrich whom I am proud to say rejects this latest attempt at blackmail."

There is no doubt that an accused is entitled to effective assistance of counsel during the plea bargaining process. *Ex parte Wilson*, 724 S.W.2d 72, 73 (Tex. Crim. App. 1987). Failure of defense counsel to inform a criminal defendant of plea offers made by the State is an omission that falls below an objective standard of professional reasonableness. *See, e.g., Ex parte Lemke*,

33

13 S.W.3d 791, 796–97 (Tex. Crim. App. 2000) (citing numerous cases holding same). As noted in *Ex parte Wilson*,

> It is important that the accused be informed of proposals made by the prosecutor; the accused, not the lawyer, has the right to decide on prosecution proposals, even when a proposal is one that the lawyer would not approve. *If the accused's choice on the question of guilty plea is to be an informed one, the accused must act with full awareness of the alternatives*, including any that arise from proposals made by the prosecutor.

724 S.W.2d at 74 (quoting *Hanzelka v. State*, 682 S.W.2d 385, 387 (Tex. App.—Austin 1984, no pet.)) (emphasis added). A defendant's right to reasonably effective assistance of counsel during the plea bargaining process likewise encompasses the requirement that defense counsel communicate an accepted plea bargain to the State. *See Randle v. State*, 847 S.W.2d 576, 580 (Tex. Crim. App. 1993).

Here, Aldrich's right to effective assistance of counsel during the plea bargaining process encompasses the requirement that defense counsel objectively and adequately convey a plea offer in a fashion enabling a defendant to make an informed decision concerning the offer. *See Ex parte Wilson*, 724 S.W.2d at 74. The record affirmatively reflects that when Aldrich rejected the plea offer—approximately two months before trial—defense counsel by his own admission still had not thoroughly investigated the case and, in fact, believed he was legally and ethically prohibited from even discussing with Aldrich

34

whether he should attempt a plea or proceed to trial. Given this belief, defense counsel characterized the offer as an improper attempt by the State at blackmail and to force defense counsel to commit malpractice. Defense counsel by his own words established that he did not function as effective counsel during the plea process because he believed that he was ethically prohibited from discussing the plea offer with his client. We hold that defense counsel failed to objectively and adequately convey the State's twenty-year plea offer to Aldrich because defense counsel failed to convey the plea offer in a fashion enabling Aldrich to make an informed decision concerning the offer and that defense counsel's conduct in this regard fell below an objective standard of reasonableness. Consequently, we hold that this conduct satisfies the first prong of the *Strickland* test.

c. **The Failure to Investigate Constitutes Deficient Performance**

In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to "counsel's perspective at the time" investigative decisions are made. *Rompilla v. Beard*, 545 U.S. 374, 381, 125 S. Ct. 2456, 2462 (2005). Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete

35

investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. *Strickland*, 466 U.S. at 690–91, 104 S. Ct. at 2066. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Id*.

Here, defense counsel was acutely aware that he needed to investigate Aldrich's case; he informed the trial court on multiple occasions that he would need sixty days, ninety days, or four months to get ready after the State turned over the "exculpatory information as [it] is required to do by *Kyles*." And defense counsel explained repeatedly that by exculpatory he meant "any information possessed by paramedics, by police department, by all the witnesses that are considered State witnesses because their knowledge is imputed to the D.A." Defense counsel purposefully decided, however, to do little (about a year after the accident, defense did go to the scene and take pictures) or no investigation until after the State had completed its investigation and had "turned over exculpatory information" per defense counsel's interpretation of *Kyles*. Based on this entrenched, legally incorrect interpretation of *Kyles*, defense counsel admitted in writing (in the letter rejecting the plea offer) that, on a date only two months before Aldrich's case actually went to trial, he had not thoroughly investigated Aldrich's case.

36

The record further reflects that defense counsel failed and refused to request permission to independently test Aldrich's blood sample, arguing again that the State had the duty to turn it over to him per *Kyles*. Finally, at one of the pretrial hearings about a month before trial, the frustrated trial court instructed defense counsel to handwrite a motion for a blood sample he could have tested. The handwritten request appears in the clerk's record and was immediately signed by the trial court.

The record also reflects that Aldrich told defense counsel that headlights from an oncoming car had blinded him. Aldrich claimed that he had told an officer at the scene about the blinding headlights. Nonetheless, relying again on his interpretation of *Kyles*—despite the fact that the prosecutor had disclosed the names of all involved officers to defense counsel[9]—defense counsel failed to undertake any investigation to verify this fact or to ascertain the identity of the particular officer. Defense counsel claimed on the record

---

[9] The record reflects the following:

[THE PROSECUTOR]: Your Honor, for the record, I'd like it to note that on January 21st of 2005 at a hearing, Defense Counsel was given the names of all of the officers. Page 17 starts at line 22 and continues on, with us even spelling their names, through line 20 of page 18.

that until a few days before trial, he was unable to learn the identity of this officer, Sergeant Bill Hall.

The record before us establishes that defense counsel neither performed a reasonable investigation nor made a reasonable decision that a particular investigation was unnecessary. Instead, even after receiving the benefit of multiple continuances, defense counsel undertook little or no investigation—until just a few weeks before the July 25, 2005 trial setting—based on the unreasonable decision that *Kyles* required the State to perform an investigation for him and to turn over all "exculpatory" matters, which defense counsel defined broadly as anything known by anyone that might lead to information helpful to Aldrich. And the record reflects defense counsel's repeated assertions that he needed sixty days, ninety days, or four months to get ready for trial, not just a few weeks.

We hold that defense counsel's failure to conduct a reasonable investigation or to make a reasonable decision that no investigation was necessary fell below an objective standard of reasonableness. There is no plausible basis in strategy or tactics for defense counsel's failure to perform an investigation that he acknowledged was needed and indicated would take sixty days, ninety days, or four months. *See Strickland*, 466 U.S. at 690–91, 104 S. Ct. at 2066; *Ex parte Amezquita*, 223 S.W.3d at 363, 368; *Ex parte Briggs*,

38

187 S.W.3d at 467. Consequently, we hold that this conduct satisfies the first prong of the *Strickland* test.

### d. Failure to Timely Obtain and Disclose Defense Experts Constituted Deficient Performance

The record affirmatively reflects that although defense counsel repeatedly recognized the need for defense experts, he did not timely designate experts for two reasons: (1) based on Aldrich's dire financial situation, and (2) on his misinterpretation of *Kyles*. Aldrich testified via a bill of exceptions about his current financial situation and bankruptcy. Specifically, Aldrich testified that he and his wife were in bankruptcy about the time the accident occurred. His bankruptcy was discharged a few months before trial. Aldrich testified that he never had enough money and could not borrow enough money to hire lighting experts. Immediately following this trial, the trial court entered a finding of indigence and appointed appellate counsel for Aldrich.

Defense counsel testified that the Aldriches "don't have the money to investigate this" and said that he, likewise, did not have the money to investigate it. Defense counsel repeatedly told the trial court that Aldrich was in a dire financial situation, stating, "We are broke;" that Aldrich had been paying him $100 per month; that defense counsel had been "drawing down" from his own retirement account to fund Aldrich's defense; and that "I've

already put out of my pocket a couple of grand in this case. I'm never going to get that back because he doesn't have any money." At one pretrial hearing, defense counsel said he needed four months before a trial setting. When the court asked why he needed four months, defense counsel explained, "[F]inancially, I'm carrying my client. . . . financially I'll need about three or four months' income from my client and from myself just to get ready. . . . I'll need at least 90 days after he [the prosecutor] says there's all the exculpatory stuff."

In fact on the fifth day of trial, defense counsel explained on the record his reasons for not hiring experts:

> We have known since my first trip out there [to the location of the accident] that lights were going to be a problem, but we were shepherding the money, and it is throughout the–all the hearings, judge . . . . Mr. Angelino says that I ought to get my evidence, but we're waiting to find out the exculpatory stuff so we'll know what things to spend our–our little money on. Nobody doubts that the Defendant is broke in this trial and so I said, [g]ive me the exculpatory suff and then–and I even said and then we'll know how to shepherd our money and see what experts we could afford.

Although the accident occurred in April 2004 and the trial court had ordered the defense to file its list of expert witnesses twenty days before the July 25, 2005 trial setting, the record reflects that Aldrich did not designate any experts until a few days before trial (except Max Courtney whom the State agreed they knew of via a motion for continuance) and did not designate a lighting expert—Richard Sullivan—until the morning of trial. Ultimately, the trial

40

court excluded the expert testimony (some testified as fact witnesses) of all experts listed by defense counsel, except Max Courtney.

At the pretrial hearings, defense counsel repeatedly indicated his intent to timely retain experts. But defense counsel's failure to timely retain experts, as explained in his own words during trial—in addition to a lack of financial resources—was based on defense counsel's decision to not hire any experts until after the State had turned over "exculpatory" information as defense counsel believed the State was required to do under *Kyles*. When it became clear that Aldrich was bankrupt and could not pay for or borrow money to pay for experts and when it became clear that the trial court did not share defense counsel's legally incorrect view of the State's obligations under *Kyles*, a reasonably competent attorney would have several options, including to withdraw from the case, explaining to the court that Aldrich was now indigent; to prove that indigency; and to request appointment of counsel or to remain as counsel with the payment of a reduced fee but request investigatory and expert witness fees from the trial court for a now-indigent client. *See Ex parte Briggs*, 187 S.W.3d at 468–69. Here, defense counsel's failure to timely designate experts was not a strategic decision, it was an economic decision and a decision based on a legally incorrect interpretation of a United States Supreme Court decision. *See id.* at 467 (recognizing record reflected defense counsel's

41

failure to consult with experts was not a strategic decision but an economic one). We hold that defense counsel's failure to timely designate experts or to make a reasoned decision that no experts were necessary—defense counsel evidently believed experts were necessary because he did attempt to designate experts, but his designation was untimely—fell below an objective standard of reasonableness. *See id.* Consequently, we hold that this conduct satisfies the first prong of the *Strickland* test.

### 2. Conduct During the Guilt-Innocence Phase of Trial

Aldrich complains that his trial counsel continued to provide ineffective assistance throughout the guilt-innocence phase of trial. He argues that trial counsel presented theories not supported by the evidence, had physical or mental infirmities that prevented effective representation, alienated the prosecutor and the trial court, misunderstood and misapplied the law, failed to properly question witnesses or to make objections, and made inaccurate statements throughout trial. Furthermore, Aldrich claims that defense counsel was ineffective because he presented harmful evidence to the jury through Aldrich's own testimony.

### a.  Presentation of Defensive Theories Not Supported by the Evidence Constituted Deficient Performance

Defense counsel's defensive theory of the case was that Mrs. Hudson committed suicide, alone or assisted by Mr. Hudson; that Mr. Hudson murdered Mrs. Hudson; or that Mrs. Hudson was at fault for failing to yield the right-of-way (defense counsel argued that because Mrs. Hudson was in a motorized wheelchair, not on foot, she was considered a vehicle instead of a pedestrian and should have yielded the right-of-way).  He explained in opening statements,

> Now, I know at this time you must be thinking, wow, this sounds like a suicide or an assisted suicide or maybe even a homicide on the part of Mr. Hudson.  That's up to you to determine from the evidence that you hear.
>
> . . . .
>
> But you will know, and I will suggest to you at the end, that people have been tried for murder with a lot less motives than Mr. Hudson [the decedent's husband, who was walking slightly behind her motorized wheel chair when she was hit] had, and people have committed suicide for a lot less motives than this woman had. That's going to be the facts.

Counsel's bizarre defensive theories of the case permeated the entire trial of the case.

Defense counsel repeatedly attempted, unsuccessfully, to elicit testimony from witnesses to support these theories.  For example, Sergeant Bill Hall

43

testified that he was a patrol sergeant with The Colony when this accident occurred. Defense counsel asked Sergeant Hall the following:

Q. The thing that she was riding in had four wheels?

A. Yes, sir, I believe it would have.

Q. She was not afoot. She was riding and it was propelled by an electric motor, was it not?

A. Yes, sir.

Q. And is that – do you know that that's the definition of a motor vehicle?

A. A motor vehicle–

    . . . .

Q. Well, let me ask you this. Did you believe in your initial investigation that the–Mr. Hudson and Mrs. Hudson had made a left turn and started walking across the crosswalk, that they would have seen the oncoming–this oncoming traffic, the one that before and during and after my client was–that ultimately hit her, that they deliberately made a left-hand turn to walk across the place where they knew that these cars were going to come? Did you realize that the night you were out there?

A. Do I believe they deliberately stepped in front of your client?

Q. That's for the jury to decide. I'm just asking you, did it–in your investigation as the senior officer out there, people with long debilitating injuries, sometimes they commit suicide, don't they?

A. In Texas, the people in the crosswalk have the right-of-way.

Q. Well, that's the wrong law, but if that's what you believe, you're incorrect.

44

. . . .

Q. All right. Now, did you, taking in the scene, the lighting, the ability to see a person that was coming as the Hudsons were, to see oncoming traffic, the realization that they walked right in front of this oncoming car, did you make sure and say, Hey, be sure to question Mr. Hudson about why he did such a thing? Did you mention, suggest, gosh, this guy had the opportunity, looks like he just walked her out there in front of the cars. Did anything like that happen?

[PROSECUTOR]: Your honor, that's an improper question. There's no evidence at all that Mr. Hudson did anything by walking somebody out into the crosswalk. I'm going to object to an improper question and assuming facts not in evidence.

These questions are merely two of a large number of questions defense counsel attempted to ask witnesses concerning the strange defensive theories he posited. The trial court routinely sustained the State's assuming-facts-not-in-evidence objections to these type of questions.

During final arguments, defense counsel continued to urge these defenses. He argued, "But we submit that the reason that Ms. Hudson is not here is her fault and nobody else's." He continued,

Mrs. Hudson and Mr. Hudson came down the street that night; that this long-suffering woman who had nothing but a more miserable existence–she might have been happy in a way, but she was getting worse. She had been bound in a wheel chair for, I think they said three years; that she couldn't even walk any more. And all of us, in our common knowledge, know that some people say why stick around. I've had a good life. I've had a good marriage. It's just going to be a drag, and I'm going to cause burden and heart break to those I love.

45

[PROSECUTOR]: Objection, Your Honor, arguing outside the facts of the case.

[THE COURT]: I'll sustain the objection.

During defense counsel's closing argument, the trial court sustained eight objections by the State that defense counsel, by bringing up these defenses, was arguing outside the record.

The prosecutor summed it up in his rebuttal:

Now, let's also talk about what Defense Counsel said because, remember, whatever he said is not evidence. It doesn't matter what he thinks. It doesn't matter at all. Let's go to the facts, the facts of this. This is a simple case, even though you've heard a bunch of stuff that typically has nothing to do with this. This is a very, very simple case. His client got intoxicated, ran over a lady in a crosswalk in a wheelchair, killed her, never hit his brakes before he hit her, never hit his brakes after he hit her, did not stop. That's the facts of this case. Now whatever you want—is that preposterous that he's trying to say she wasn't a pedestrian? Is that what they're hanging their whole case on? Does that make you sick? Or that she committed suicide. You look at that man. Is that someone who helped his wife commit suicide or murder, as he said in opening statement? Is that not crazy? Is that not sickening?

The record supports none of the three mentioned defenses: Mrs. Hudson committed suicide, either alone or assisted by Mr. Hudson; that Mr. Hudson murdered Mrs. Hudson; or that Mrs. Hudson was at fault for failing to yield the right-of-way—because she was in a motorized wheelchair. Defense counsel's persistence in raising these defenses from opening statement through closing

46

argument over the State's repeatedly sustained outside-the-evidence objections fell below an objective standard of reasonableness. Consequently, we hold that this conduct satisfies the first prong of the *Strickland* test.

> **b.** **Record Does Not Establish that Defense Counsel's Physical and Mental Infirmities Themselves Constituted Deficient Performance**

During a pretrial hearing, defense counsel asked the trial court if he could sit down and told the court, "I have an emergency supply of oxygen and will try not to do that in front of the jury." Seven days before the second trial setting, defense counsel filed a motion for continuance alleging that "this 72 year old lawyer has had failing hearing ability for over a year, and for no apparent reason both hearing aids ceased to operate two weeks ago." The trial court granted a continuance. Approximately a month later, defense counsel began his voir dire with the statement, "Now you're going to hear the other end of the spectrum. I'm not full of vim, vigor and vitality like [the prosecutor] is. I'll be 73 my next birthday. I've only got one lung. So the reason I'm standing back here, in the back, if my voice drops because I am out of air, if you'll just raise your hand." One day of the trial, after frequently asking the court, counsel, and witnesses to repeat themselves, defense counsel told the court,"If the Court's interested, I left my hearing aids in my ashtray of the car that I rode down here in. I forgot to bring them upstairs." At still another point, defense

47

counsel acknowledged that a witness might be having a hard time hearing defense counsel's questions because "I might run out of breath."

The record is peppered with instances in which the jury, the court reporter, the trial court, and the witnesses could not hear defense counsel and instances in which defense counsel could not hear the person speaking.[10] During closing argument, apparently in recognition of his deteriorating physical state, defense counsel told the jury, "[Y]ou know, this is probably the last big case I'll ever try."

The record also reflects that defense counsel repeatedly became confused, even once asking the trial court to remind him as to what a particular witness was supposed to testify to in his bill of exceptions. Defense counsel

---

[10] The following are some examples: the trial court told defense counsel that a witness could not hear him and that he needed to speak into the microphone; the trial court asked defense counsel, "Are you still having trouble hearing?"; the jury told the bailiff that they could not hear defense counsel; the trial court later said, "You'll need to speak up, the jurors can't hear you"; the trial court asked defense counsel at least three times to speak up because the court could not hear him; the court reporter said that she could not hear defense counsel; defense counsel at various points during trial said, "I didn't hear you," "I am having a hard time hearing," "I am just hard of hearing," "I've got hearing aids and they're playing tricks on me," "Your Honor, I just cannot hear," "I didn't hear what she said," "Am I hearing things?" "I'm deaf, could you speak up?" "I can't hear you," "It's my hearing, its not you, I promise," and "I am hard of hearing." The background noise caused by the air conditioner apparently exacerbated defense counsel's difficulties in hearing and being heard.

could not remember why he had asked the trial court for permission to make a bill of exceptions and when the witness was brought back, counsel said, "I'm trying to remember what I was doing." During the charge conference, defense counsel cited a 1958 civil case to the trial court and explained that he may not have Shepardized it because "my partner just had a baby. She went out. I've done the very best I can since the 17th of December, and I work Saturdays and Sundays and it's difficult for me to keep up, as you well might imagine."

Although the record supports the conclusions that defense counsel was hard of hearing, that defense counsel's speech was difficult to hear, and that defense counsel became confused at points during the trial, these facts in and of themselves do not constitute deficient performance. *Compare Cannon*, 252 S.W.3d at 349–50 (holding defense counsel's behavior as a whole—doing nothing because he was unprepared to go forward—constituted ineffective assistance of counsel), *with Moore v. State*, 227 S.W.3d 421, 422, 427 (Tex. App.—Texarkana 2007, pet. ref'd) (holding defense counsel's behavior in allegedly falling asleep during prosecutor's cross-examination of defendant did not constitute ineffective assistance of counsel). The record reflects that defense counsel typically asked the witnesses or the trial court to repeat themselves if he was unable to hear; that the witnesses, trial court, jury, and court reporter asked defense counsel to speak up when they could not hear

49

him; and that the trial court reoriented defense counsel when he expressed confusion. Under these circumstances, we cannot hold that defense counsel's physical infirmities or episodes of mental confusion in and of themselves constitute deficient performance. This challenged conduct does not meet the first prong of *Strickland*.

### c. Record Does Not Establish that Defense Counsel's Alienation of the Prosecutor and the Trial Court Constituted Deficient Performance

The record reflects that defense counsel alienated the prosecutor and the trial court throughout trial, usually by arguing that the prosecutor was not complying with, and that the trial court was not enforcing, the mandates of *Kyles*. Defense counsel repeatedly made sidebar comments, oftentimes about the prosecutor, and frequently argued with the trial court. But we have found no authority for the proposition that defense counsel's acerbic and audacious trial style rendered his performance deficient. Although Aldrich is correct that the record affirmatively demonstrates defense counsel's repeated alienation of the prosecutor and the trial court, we cannot hold that this conduct meets the first prong of *Strickland*.[11]

[11] For example, the day trial commenced, defense counsel filed a motion attacking the prosecutor's credibility and requesting relief because "the defense could not have anticipated that the State would ignore your Orders." At one point during the trial, the frustrated prosecutor said, "Your Honor, I'm going to

### d. Continued Misunderstanding of the Law Constituted Deficient Performance

In his opening statement, defense counsel again defaulted to his *Kyles* position; he told the jury that

> [t]he State has an obligation to look at the case as a whole, to discover what's good for them and what's good for us, to let us know what's good for us because at the end of the case you're going to realize that they had several billion dollars' worth of equipment and facilities that allowed them to fully investigate this case. And you'll also find out that the Defendant was in bankruptcy, so we're not playing on an even playing field. And because of that, they have to find out things that will help us and tell us about it. That's the law.

---

object, again, to Defense Counsel basically lying to the Court again." At another point during trial, defense counsel asked Captain Chris Chandler, "Did I tell you for all the good it did me, that a District Court Judge in this case had issued an order for the D.A.'s to release to me exculpatory information and nothing had been forthcoming when we talked?" At another point in the trial, defense counsel began an objection by telling the trial court judge, "You know that–I know that you think that Mr. Angelino is a wonderful fellow, but . . . ." The trial court responded in part, "First of all, Mr. Angelino did not ask the question [it was the other prosecutor] . . . . And, number two, you do not know what I think about Mr. Angelino." At still another point, defense counsel began a cross-examination question of a State's witness, "Officer, you said that under the leading questions of the Prosecutor that"—to which the prosecutor lodged a sidebar-comment objection. At still another point, in response to both sides' comments, the trial court stated, "Okay. I'll tell you what. I'll tell everybody this, and I'll tell you one at a time. I'm not going to let this trial get out of hand. I don't want any sniping back and forth anymore. I don't want any bad-mouthing." In closing arguments, defense counsel argued that "[t]here are many, many different types of crimes which Mr. DiAngelo, [sic] who described himself as the one all and be all of the prosecution for DWI cases in Denton County. . . ."

51

Finally, on the third day of trial, the trial court indicated that he did not want to hear anything else about *Kyles*. But defense counsel continued to bring it up, stating, "I don't have to have my discovery like you would do it or like you wish or the Prosecutor. I can rely on the Supreme Court decisions, which I did do, pretty carefully, Judge . . . . And that's all that's required by the case that I'm not supposed to mention in front of you [i.e. *Kyles*]." Thus, defense counsel persisted in his misinterpretation of *Kyles*, even after the trial court had repeatedly explained his misunderstanding and had asked him not to mention *Kyles* again.

Other instances demonstrated counsel's misunderstanding of the rules of evidence. At one point during trial, defense counsel urged the trial court to admit letters to rebut some testimony by a State's witness based on the rule of optional completeness. When the trial court asked whether the rule of optional completeness referred only to written documents, defense counsel responded, "No, it does not." *See* Tex. R. Evid. 107. At another point during trial, defense counsel attempted to impeach one witness with a report generated by a different witness. *See* Tex. R. Evid. 613. At still another point, trial counsel asked permission to take Officer Morton on voir dire under "Daubert-Kelly" but then proceeded to ask the witness factual questions having

52

nothing to do with his qualifications or his expert testimony. *See* Tex. R. Evid. 702.

We hold that defense counsel's continued misunderstanding of *Kyles* and his misinterpretation of the rules of evidence fell below an objective standard of reasonableness. Even giving a heavy measure of deference to defense counsel's conduct, no plausible strategy exists for counsel's continued misunderstanding of the law and of the rules of evidence. *See, e.g., Ex parte Welch*, 981 S.W.2d at 185. Consequently, we hold that this conduct satisfies the first prong of the *Strickland* test.

### e. Failure to Properly Question Witnesses Constituted Deficient Performance

The record reflects that defense counsel had great difficulty questioning witnesses. He repeatedly made sidebar comments during his questioning. The trial court repeatedly warned defense counsel not to make sidebar comments. Finally, on the fourth day of trial, the trial court sustained another of the State's objections to defense counsel's sidebar remarks and then warned counsel, "[O]ne more time, no sidebar comments." After sustaining still more objections by the State to defense counsel's sidebar comments, the trial court warned defense counsel, "I'll tell you what, the next time you make a sidebar comment, I am going to hold you in contempt of Court, over and out; do you understand

53

that?"  After sustaining yet another objection by the State to defense counsel's sidebar comments, the trial court explained,

> I believe that I've indicated to you several times over the past six days now that you were on the verge of contempt, but you continue to make sidebar comments, and I find that very offensive. And I think this morning you went well beyond what you should have.  I believe the State had to at least twice object to your sidebar comments.  And what I'm going to do is I'm going to hold you in contempt of court, and I'm going to sentence you to three days in the Denton County jail and fine you $500.  But the sentence will not take place until after this trial is over.

At one point in the record, earlier during the trial, defense counsel argued with the trial court over what exactly constituted a sidebar comment, and the record could be construed as demonstrating that defense counsel did not understand what constituted a sidebar comment.

Additionally, during his efforts to question witnesses, defense counsel repeatedly interjected his own testimony into his questioning.  The trial court sustained over thirty objections by the prosecutors that defense counsel was testifying.

Defense counsel also repeatedly asked—over eighteen times—that the jury be removed so that he could question various witnesses outside the jury's presence.  The patient trial court typically granted defense counsel's request. For example, during the testimony of a fact witness, the following occurred:

54

[DEFENSE COUNSEL]: I object and ask that the jury be removed. If I'm hearing right, did you have a conversation with me before.

[THE COURT]: Okay. Verney, take the jury out.

[THE BAILIFF]: All rise for the jury.

(Jury out)

[THE COURT]: Let the record reflect that the jury is not now present.
	State, present and ready?

[PROSECUTOR]: Yes, Your Honor.

[THE COURT]: Defense, present and ready?

[DEFENSE COUNSEL]: I would like to—

[THE COURT]: Is the Defense present and ready?

[DEFENSE COUNSEL]: Excuse me. Yes, and I would like to do something, if I may, since the appellate court teaches us when something—sight happens, that's not reflected in the record, we could read it into the record. I would like the record to reflect that the District Attorney pointed her finger down in the loop at the end of the drive and says, Do you remember when you were talking to me before, you said, and pointed her finger down there. I object to that. If the D.A. says that she wasn't doing that then I certainly want to give her an opportunity to deny it, but in the absence of denial, I object to what's occurring.

[PROSECUTOR]: I don't hear a legal objection, your Honor.

[THE COURT]: I don't hear a legal objection.

[DEFENSE COUNSEL]: I object she's leading and suggestive to the witness contrary to what she just said. That's my objection.

[THE COURT]: Okay. We didn't need to take the jury out for a leading objection.

[DEFENSE COUNSEL]: But I did need the jury to be absent because it's required—so I can read in the record what I saw happening. The Court says that's supposed to be outside the presence of the jury.

[THE COURT]: All right. Don't lead the witness.

[PROSECUTOR]: Your Honor, I'm impeaching the witness. I'm allowed to impeach my own witness as to the statement she's made before.

[THE COURT]: Okay.

[DEFENSE COUNSEL]: But the District Attorney has made herself a witness in the case now. That's my opinion.

[THE COURT]: Well, be that as it may, it's not my opinion. Bring the jury back in.

At one point, defense counsel improperly attempted to impeach a witness—Mr. Hudson—with what defense counsel believed to be a prior inconsistent statement. At the conclusion of the testimony that day, the following colloquy occurred:

[THE COURT]: What other matters do you have?

[DEFENSE COUNSEL]: Judge, I have here a statement from Donald Hudson that I believe contains prior inconsistent statements to his testimony.

[THE COURT]: Okay.

[DEFENSE COUNSEL]: And that's what I was asking him about, have you ever said so and so. She [the prosecutor] would object and the Court sustained the objection.

[THE COURT]: That's correct. I don't think you were impeaching him properly. There's a way to do it and a way not to do it. You weren't doing it correctly.

In addition to generally challenging defense counsel's competency in questioning witnesses, Aldrich also claims that defense counsel failed to properly attack the relevance and admissibility of retrograde extrapolation and failed to cross-examine the State's witnesses about retrograde extrapolation. We agree with the State, however, that the record does not establish the absence of any plausible strategy or tactic exists for this particular claim of alleged deficient performance. As pointed out by the State, defense counsel could have reasoned that a question to the State's retrograde extrapolation witness based on the defense's contention that Aldrich consumed three beers between 2:30 and 6:00 p.m. could have produced a damaging answer, i.e., that a blood test showing .07 at 11:00 p.m. could not be achieved if Aldrich had consumed only three beers between 2:30 and 6:00 p.m.

And defense counsel successfully elicited testimony from Max Courtney that the degradation of the alcohol in Aldrich's blood from a .07 to a .04, which the State posited occurred during the time between when the blood was drawn and the time when it was tested by Aldrich, would not be typical. The record

57

as a whole, however, establishes that defense counsel experienced great difficulty in questioning the witness without making sidebar comments or interjecting his own testimony through the questions he asked. Defense counsel's conduct in continuing to make sidebar comments to the point that he was held in contempt and his conduct in continuing to interject his testimony into the case through his questioning fell below an objective standard of reasonableness. No reasonable or plausible trial strategy exists for counsel's continued, wide-ranging sidebar comments or for his repeated improper interjection of his own testimony into his questions. Consequently, we hold that this conduct satisfies the first prong of the *Strickland* test.

### f. Inaccurate Factual Statements Constituted Deficient Performance

Aldrich next points out that defense counsel made inaccurate statements and arguments; Aldrich concedes that the statements were not in and of themselves ineffective assistance but argues that when viewed in light of counsel's other deficiencies, these errors show defense counsel's faltering memory and wholesale ineffectiveness.

The record reflects numerous inaccurate statements by defense counsel. Counsel mistakenly recited that Aldrich's blood test result was a .17 rather than a .07. Another time, defense counsel stated in a hypothetical that the retest

58

of Aldrich's blood sample revealed a .40 blood alcohol level rather than a .04. Defense counsel frequently forgot the prosecutor's name or called the prosecutor by the wrong name. Defense counsel referred to Aldrich by the wrong name several times, referring to Aldrich as Mr. Ingle or Mr. Hudson; defense counsel referred to witness Terri Wester as Terri Webster and referred to Sergeant Bill Hall as Bill White and Bill Clark. During closing argument, defense counsel referred to Officer Vaughn, a female officer, as Mr. Vaughn and argued that Vaughn was the officer who administered the field sobriety tests when it was in fact Officer Slack. These examples are not exhaustive but merely a sampling of the inaccurate factual statements made by defense counsel on the record and that are set forth in Aldrich's brief.

The prosecutor, in rebuttal, again brought defense counsel's conduct into clear focus:

> You know, I almost wanted to start with something Danny DeVito said in "My Cousin Vinney," when he was talking about his opening statement, but I can't say that. Because, obviously, it seems like Defense Counsel's memory is not as good as it should be. Let me try to tell you what the facts really were.
> First of all, it wasn't Officer Vaughn who did the field sobriety test. It was Officer Slack, right there. Officer Vaughn, who's a female, so it wasn't Mr. Vaughn. And by the way, I'm not Mr. DiAngelo. I'm Mr. Angelino.

We hold that defense counsel's misstatements of facts and names during Aldrich's trial fell below an objective standard of reasonableness. Such

59

misstatements cannot be part of any trial strategy. Consequently, we hold that this conduct satisfies the first prong of the *Strickland* test.

### g. Adducing Damaging Testimony from Mr. Aldrich Did Not Constitute Deficient Performance

Aldrich finally contends that defense counsel was ineffective by permitting Aldrich to testify during the guilt-innocence phase and by eliciting damaging and prejudicial testimony from Aldrich. The record reflects—in the bill of exceptions made by Aldrich—that Aldrich did not intend to testify until approximately one week before trial when defense counsel claimed that he learned for the first time the identity of the police officer to whom Aldrich had spoken at the scene and told that he was blinded by the lights of oncoming traffic.

> Q. In conference with your lawyers and your spouse up until you found out about—was the decision made that you were not going to testify so that you wouldn't have to give up the fact of your record in the—getting—and getting into a he said/she said situation, unless we could find that exculpatory—unless we knew who it was, that it was not worth sacrificing to the jury to not know about your record in return for at least telling your story about it; is that correct?
>
> A. Yes.
>
> Q. When at last you learned from Mr. Angelino and his informational, I believe it was a fax just a few days before this trial began—I thought a few days. It might have been a week. About who it was, and he was at one time even subpoenaed; you even

60

mentioned in the record, but not what he knew. There was a team making a different decision. Now you were going to testify?

A. Yes.

Thus, the record reflects the reasoning underlying Aldrich's decision to testify; defense counsel determined that Aldrich's testimony—that at the scene he told a police officer that he did not see the Hudsons because of the glare of oncoming headlights—would be corroborated by Sergeant Hall.

During Aldrich's testimony, defense counsel elicited testimony from him that he had three prior DWI convictions; he was charged with a fourth which resulted in the revocation of his parole for the third one. Defense counsel did, as pointed out by Aldrich, ask Aldrich some strange and seemingly prejudicial questions, like on the day of the accident, "Did you ever take—smoke any pot?" And no factual information was garnered by Aldrich's testimony that was not already before the jury, except his statement that he could not see the Hudsons.

While in a case of this nature, based on the cold record before us, it stretches credulity to seriously believe that a "team decision" that Aldrich should testify could be part of a reasonable trial strategy, we are required to give great deference to defense counsel's decisions. As the State points out, the trial court admonished Aldrich before he testified that the final decision on

whether to testify belonged to him alone. And the record reflects that Aldrich understood that if he testified, his prior criminal record would be revealed; thus, he initially had decided not to testify. Apparently Aldrich's "team" weighed all of the negatives of Aldrich's testifying and, as set forth in the record, determined that the admission of Aldrich's testimony that he could not see the Hudsons along with Sergeant Hall's corroborating testimony on this point outweighed the negatives. Thus, under the deferential standard of review that we are required to apply, we cannot say that defense counsel's conduct in permitting Aldrich to testify and in adducing damaging testimony from him was without any plausible basis. *See Ex parte Burns*, 601 S.W.2d 370, 372 (Tex. Crim. App. 1980) (holding error in trial strategy will be considered ineffective assistance of counsel only if counsel's actions are without any plausible basis). Consequently, we hold that this particular conduct challenged by Aldrich fails to satisfy the first prong of the *Strickland* analysis.

### 3.  Conduct During the Punishment Phase of Trial

Also in his first issue, Aldrich claims that defense counsel was ineffective at the punishment phase of trial by failing to object on Confrontation Clause grounds to the improper reading of the victim impact statements before punishment was assessed and by failing to offer any argument at punishment at all. We need not, however, reach this portion of Aldrich's first issue because

62

as discussed below, we will sustain his second issue claiming that the trial court erred by permitting victim impact statements to be read before the trial court had assessed punishment.[12]

## C.    Second Prong of the Strickland Analysis

Because we have held that defense counsel's pretrial conduct in misunderstanding the law, failing to adequately convey the plea offer, failing to conduct a reasonable investigation, and failing to timely obtain and disclose defense experts constituted deficient performance and that defense counsel's trial conduct in presenting defensive theories not supported by the evidence, continuing to misunderstand the law, failing to properly question witnesses, and his making inaccurate factual statements constituted deficient performance during the trial on guilt-innocence, we now address the second prong of the required *Strickland* test.  That is, we examine whether there is a reasonable

---

[12] A holding that defense counsel was ineffective during the punishment phase of trial would entitle Aldrich only to a new punishment hearing, the same relief he claims he is entitled to in his second point.  *See* Tex. Code Crim. Proc. Ann. art. 44.29(b) (Vernon Supp 2008); *Hernandez v. State*, 988 S.W.2d 770, 772 (Tex. Crim. App. 1999) (holding the two-pronged *Strickland* standard applies to alleged counsel's ineffectiveness at punishment phase of non-capital trial).  Because all members of the en banc court agree that Aldrich is entitled to a new punishment hearing based on his second point and because, as set forth herein, we sustain Aldrich's second point, we need not address the punishment phase ineffectiveness claim portion of his first point.  *See* Tex. R. App. P. 47.1.

63

probability that, but for counsel's deficiency, the result of the trial would have been different. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. The question or "benchmark" of our analysis is whether Aldrich has shown by a preponderance of the evidence that his defense counsel's deficiency so compromised the proper functioning of the adversarial process that the trial court cannot be said to have produced a reliable result. *Id.* at 686, 104 S. Ct. at 2064; *Ex parte Amezquita*, 223 S.W.3d at 368. In analyzing *Strickland*'s prejudice prong, we examine counsel's errors not as isolated incidents, but in the context of the overall record. *Ex parte Menchaca*, 854 S.W.2d 128, 132 (Tex. Crim. App. 1993). That is, we consider "whether those specific deficient acts or omissions, in their totality, prejudiced the defense." *Ex parte Nailor*, 149 S.W.3d 125, 130 (Tex. Crim. App. 2004). Thus, we briefly examine the overall record juxtaposed with the totality of defense counsel's specific deficient acts or omissions.

The State called seventeen witnesses, and the defense called eight. We have carefully and repeatedly reviewed the record to place Aldrich's allegations of and our determinations of ineffectiveness in the context of the entire record and the totality of defense counsel's representation. The bulk of defense counsel's cross-examination of the State's witnesses focused on eliciting testimony concerning defense counsel's defensive theories that the accident

64

was a suicide, assisted suicide, or Mrs. Hudson's fault for failing to yield the right-of-way. For example, defense counsel asked Sergeant Hall, "[I]n your investigation as the senior officer out there, people with long debilitating injuries, sometimes they commit suicide, don't they?" And Sergeant Hall answered, "In Texas, the people in the crosswalk have the right-of-way." As another example, defense counsel repeatedly asked whether officers had questioned Mr. Hudson about pushing his wife in front of an oncoming car. In most instances, the trial court sustained the State's assuming-facts-not-in-evidence objections.

Defense counsel did make some effective points in his cross-examination of Kenneth Evans, the drug supervisor at the Department of Public Safety located in Garland, and excluded a study offered by the State to show evaporation of alcohol from blood over time on the ground that blood in the study was stored differently than Aldrich's blood was stored. And, likewise, defense counsel called Max Courtney to testify as an expert on blood storage and established that it would not be typical for Aldrich's blood alcohol level to degrade from a .07 to a .04, suggesting that perhaps the initial .07 blood alcohol level was incorrect. Defense counsel established that the lights at the scene were ornamental-type globe lights positioned on fifteen-foot poles and that the lighting "could improve." Defense counsel elicited testimony that the

65

Hudsons did not have on any reflective clothing and neither was carrying a flashlight. And, finally, defense counsel called four fact witnesses who were with, or spoke with, Aldrich at various times throughout the day and early evening prior to the 8:30 p.m. accident; all testified that he did not appear intoxicated or to have lost the normal use of his mental or physical faculties.

Despite counsel's having been able to raise some legitimate defensive points, the record nevertheless shows that counsel's deficient performance resulted in a trial without a reliable result. The overall record reflects that defense counsel's deficient performance, as set forth above, was not an isolated incident. The totality of defense counsel's errors pervaded and prejudiced the entire defense, from pretrial conduct in misunderstanding the law, failing to adequately convey the plea offer, failing to conduct a reasonable investigation, and failing to timely obtain and disclose defense experts to trial conduct in presenting defensive theories not supported by the evidence, continuing to misunderstand the law, failing to properly question witnesses, and repeatedly making inaccurate factual statements. Both the prosecutor and the trial court—who recognized early on that defense counsel was "almost per [se]" rendering ineffective assistance of counsel—attempted to minimize the impact of defense counsel's failings by voluntarily turning over materials to him that he did not ask for, by instructing him on how to obtain Aldrich's blood sample, by

66

dictating the names of the involved police officers to him on the record at a hearing six months before trial, and by assisting him in other ways throughout the proceedings. Aldrich, however, was entitled to be represented by competent, effective counsel, not to be forced to rely upon the goodwill and good graces of the fair-minded prosecutor and the patient trial court. The fact that the prosecutor and the trial court—as evidenced throughout the record—felt compelled to assist defense counsel based on the perceived almost per se ineffectiveness of defense counsel establishes that defense counsel "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

Here, the record before us undisputedly establishes "the benchmark for judging any claim of ineffectiveness," that is, that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S. Ct. at 2064; *Ex parte Briggs*, 187 S.W.3d at 466–67 (granting habeas relief on ineffective assistance of counsel grounds because defense counsel failed to investigate or obtain experts for economic reasons, not as trial strategy); *Menchaca*, 854 S.W.2d at 132–33 (holding that when defendant's guilt or innocence turned on the credibility of the witnesses, counsel rendered ineffective assistance by failing to file a motion in limine regarding inadmissible

67

prior convictions and by failing to object when evidence of the convictions was presented); *see also Fuller v. State*, 224 S.W.3d 823, 837 (Tex. App.—Texarkana 2007, no pet.) (holding counsel's failure to object to inadmissible testimony was, in essence, no strategy and was ineffective); *Walker v. State*, 195 S.W.3d 250, 264 (Tex. App.—San Antonio 2006, no pet.) (holding numerous deficient acts or omissions by counsel, in their totality, prejudiced the defense); *Hall v. State*, 161 S.W.3d 142, 153–54 (Tex. App.—Texarkana 2005, pet. ref'd) (holding counsel was ineffective by failing to object to admission of extraneous matters); *Stone v. State*, 17 S.W.3d 348, 353–54 (Tex. App.—Corpus Christi 2000, pet. ref'd) (holding that defendant was deprived of a fair trial with a reliable result when counsel elicited evidence of an inadmissible prior murder conviction, thus diminishing defendant's credibility and giving substance to testimony of State's witnesses that defendant had threatened to kill them).

We hold that Aldrich has established by a preponderance of the evidence that the totality of counsel's constitutionally deficient performance prejudiced his defense, that defense counsel's errors were so serious that he was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment, that defense counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as

having produced a just result, and that but for defense counsel's performance, the result would have been different.  We sustain Aldrich's first point.

## V.  VICTIM IMPACT STATEMENTS

In his second point, Aldrich claims that he is entitled to a new punishment hearing because the trial court erred by admitting victim impact statements before he assessed punishment or sentenced Aldrich.  Aldrich elected to have the trial court assess his punishment.  After both sides rested and closed on punishment and after the State's closing argument, the State asked to have some unidentified people read unsworn statements to the trial court.  Defense counsel questioned the timing of the reading of the statements, stating, "I could be wrong, but I thought that the sentence was supposed to be invoked, and then the statements."  The prosecutor responded that the statements were supposed to be read before sentence was pronounced.  The trial court permitted an unknown number of unidentified people to read unsworn statements off the record.

Apparently, as evidenced by the following exchange, at least some of the statements were critical of, or discussed the emotional impact of, defense counsel's bizarre defensive theories of the case.  After the statements were read in open court and off the record, the following exchange occurred:

69

[DEFENSE COUNSEL]: Judge, because you have heard this and *may consider it in assessing punishment, mistakenly believing that the suicide belief originated with us*, I'd like the opportunity to address you and the family so they will know that those ideas did not originate with this defense.

[PROSECUTOR]: I object. He's rested. He's done everything already. It's over.

[DEFENSE COUNSEL]: But—

THE COURT: It's over, sir. Anybody else?

. . . .

[DEFENSE COUNSEL]: May it please the court?

THE COURT: Yes.

[DEFENSE COUNSEL]: What I have to say—*those personal attacks would not have been relevant or admissible,* couldn't have [gotten] them into evidence because of the Court's rulings. Things like that were not admissible. I'd like a chance to explain that before you and if you say so, then, that's no.

[THE COURT]: I said no. It's done. [Emphasis added.]

Article 42.03, section 1(b) provides as follows:

(b) The court shall permit a victim, close relative of a deceased victim, or guardian of a victim, as defined by Article 56.01 of this code, to appear in person to present to the court and to the defendant a statement of the person's views about the offense, the defendant, and the effect of the offense on the victim. The victim, relative, or guardian may not direct questions to the defendant while making the statement. The court reporter may not transcribe the statement. The statement must be made:

70

(1) *after* punishment has been assessed and the court has determined whether or not to grant community supervision in the case;

(2) *after* the court has announced the terms and conditions of the sentence; and

(3) *after* sentence is pronounced.

Tex. Code Crim. Proc. Ann. art. 42.03, § 1(b) (Vernon Supp. 2008) (emphasis added). The legislature provided for these statements to be made only after sentencing to alleviate any risk that the statements would affect the partiality of the court during the punishment phase of trial. *Johnson v. State*, 286 S.W.3d 346, 349 (Tex. Crim. App. 2009); *Garcia v. State,* 16 S.W.3d 401, 408 (Tex. App.—El Paso 2000, pet. ref'd) (citing Keith D. Nicholson, *Would You Like More Salt With That Wound? Post-Sentence Victim Allocution in Texas,* 26 St. Mary's L.J. 1103, 1114–15 (1995)); *see State v. Aguilera,* 165 S.W.3d 695, 706 (Tex. Crim. App. 2005) (Keller, P.J., dissenting) (noting same). We hold that the trial court erred by allowing such statements to be made before sentence was pronounced in violation of article 42.03, § 1(b). Tex. Code Crim. Proc. Ann. art. 42.03, § 1(b); *see Gifford v. State,* 980 S.W.2d 791, 792–93 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) (holding that the trial court should not have allowed the complainant's father

to make a statement to the court regarding the father's views of the offense and the proper punishment before punishment was assessed).

The State argues that nonetheless the trial court properly allowed the victim impact statements to be read prior to the assessment of punishment under article 56.03(e) of the code of criminal procedure. Article 56.03(e) authorizes the trial court to consider, before sentencing, the information provided in *written* impact statements, made on a form authorized by article 56.03, that the court has already received.[13] Tex. Code Crim. Proc. Ann. art. 56.03(e) (Vernon 2006). No evidence exists that the trial court in this case received written victim impact statements that complied with article 56.03. Therefore, article 56.03(e) is not applicable.

Having concluded that the trial court improperly permitted unidentified persons to read their own statements to the court off the record prior to the trial court's assessment of punishment or pronouncement of sentence, we must

---

[13] The Texas Crime Victim Clearinghouse form is sent to victims to collect certain information regarding the impact of crimes on victims. *See* Tex. Code Crim. Proc. Ann. art. 56.03(b); *Fryer v. State,* 68 S.W.3d 628, 632 (Tex. Crim. App. 2002); *see also Truehitt v. State,* 916 S.W.2d 721, 722–23 (Tex. App.—Beaumont 1996, no pet.) (holding that trial court properly admitted written victim impact statements at punishment hearing under article 56.03). The victim's personal views about the offense and the defendant are not admissible before punishment is assessed. *Compare* Tex. Code Crim. Proc. Ann. art. 42.03, § 1(b), *with id.* art. 56.03(b).

conduct a harm analysis.  Because the error involves a statutory violation, we treat the error as nonconstitutional for the purpose of conducting a harm analysis and must disregard it unless it affected Aldrich's substantial rights. *Gray v. State,* 159 S.W.3d 95, 98 (Tex. Crim. App. 2005); *see* Tex. R. App. P. 44.2(b).

Ordinarily in conducting this harm analysis, we consider whether the error had a substantial and injurious effect or influence in determining the jury's verdict.  *King v. State,* 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).  The court of criminal appeals has held, however, that this test "is not helpful in evaluating error in non-jury proceedings."  *Johnson v. State,* 72 S.W.3d 346, 348 (Tex. Crim. App. 2002).  Instead, in determining whether substantial rights were affected by trial court error in a nonjury proceeding, we consider whether the defendant had "a right to that which the error denied."  *Id.*

Because various unidentified witnesses stood and read their own statements to the trial court prior to the trial court's assessment of punishment or pronouncement of sentence—i.e., during the punishment phase of trial—Aldrich had the right to confront and cross-examine them.  *Russeau v. State*, 171 S.W.3d 871, 880 (Tex. Crim. App. 2005), *cert. denied*, 548 U.S. 926 (2006); *Carroll v. State*, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996) (recognizing that confrontation is the check and balance that ensures fairness

73

in our adversary system of justice, and cross-examination is the essential means by which opponents test evidence proffered against them); *cf.* Tex. Code Crim. Proc. Ann. art. 56.03(e) (providing that, before a trial court considers a written victim impact statement in assessing punishment, the court must give the accused the opportunity to read and comment on the statement and, with court approval, to introduce testimony or other information alleging a factual inaccuracy in the statement). The trial court denied Aldrich that right. We hold that the trial court's error in admitting the off-the-record statements before assessment of punishment and sentencing in violation of article 42.03, section 1(b) and the trial court's refusal to permit Aldrich to respond to or cross-examine these witnesses affected Aldrich's substantial rights. We sustain Aldrich's second point.

## VI. CONCLUSION

Having overruled Aldrich's seventh point and having sustained his dispositive first and second points, we reverse the trial court's judgment and remand this case for a new trial.[14] Because we have sustained Aldrich's first

---

[14] Aldrich asserts that because we have held that he received ineffective assistance of counsel under the first *Strickland* prong in connection with the twenty-year plea offer, we should order the plea offer reinstated. When a defendant receives ineffective assistance of counsel in connection with a plea offer, in order to satisfy the second *Strickland* prong, the defendant must establish that but for the ineffective conduct he would have accepted the plea

74

and second points, we need not address his third through sixth points. *See*

Tex. R. App. P. 47.1.


SUE WALKER<br>JUSTICE

EN BANC

CAYCE, C.J. filed a dissenting and concurring opinion.

PUBLISH

DELIVERED: August 25, 2009

---

offer. *See Dickerson v. State*, 87 S.W.3d 632, 638 (Tex. App.—San Antonio 2002, no pet.); *Ex parte Lemke*, 13 S.W.3d at 798; *State v. Williams*, 83 S.W.3d 371, 374–75 (Tex. App.—Corpus Christi 2002, no pet.); *see also Turner v. State*, 49 S.W.3d 461, 471 (Tex. App.—Fort Worth 2001, pet. dism'd) (reinstating offer when counsel failed to communicate offer's deadline to defendant and defendant attempted to accept offer after deadline had passed); *Paz v. State*, 28 S.W.3d 674, 676 (Tex. App.—Corpus Christi 2000, no pet.) (reinstating offer when counsel failed to inform defendant of offer and defendant said he would have accepted offer); *Atkins v. State*, 26 S.W.3d 580, 583 (Tex. App.—Beaumont 2000, pet. ref'd) (same). Aldrich has not made that showing here. Accordingly, we decline to order the plea offer reinstated.



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-05-303-CR

ALLEN JOHN ALDRICH                                                    APPELLANT

V.

THE STATE OF TEXAS                                                         STATE

------------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

## DISSENTING AND CONCURRING OPINION ON REHEARING

------------

I respectfully dissent to the majority's holding that Aldrich has established by a preponderance of the evidence that, but for counsel's performance, the result would have been different.  While I agree with the majority's holding that counsel's performance was deficient, I do not believe the preponderance of the evidence shows that his conduct so undermined the functioning of the adversarial process that the trial produced an unjust result.  I would, therefore, overrule Aldrich's first point.  Because I concur with the majority's disposition

of the second point, I would reverse the trial court's judgment and remand the case to the trial court for a new punishment trial.  I would affirm the remainder of the trial court's judgment.


JOHN CAYCE
CHIEF JUSTICE

DELIVERED: August 25, 2009