

# NUMBER 13-23-00593-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**THOMAS CARL NORMAN,**                                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                    **Appellee.**

## ON APPEAL FROM 24TH DISTRICT COURT
## OF JACKSON COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Tijerina and Peña
Memorandum Opinion by Chief Justice Contreras**

Appellant Thomas Carl Norman challenges his convictions of aggravated assault with a deadly weapon, a second-degree felony, and manufacture or delivery of methamphetamine in the amount of four grams or more but less than 200 grams, a first-degree felony. *See* TEX. PENAL CODE ANN. § 22.02(a)(2), (b); TEX. HEALTH & SAFETY CODE ANN. § 481.112(d). Norman pleaded true to the alleged enhancements, increasing the

range of punishment applicable to each offense. *See* TEX. PENAL CODE ANN. § 12.42. The jury assessed punishment at ninety-nine years' imprisonment as to both charges, and the trial court ordered the sentences to run concurrently. Norman's sole argument on appeal is that he received ineffective assistance of counsel during the guilt/innocence and punishment stages of trial. We affirm in part, and reverse and remand in part.

## I. BACKGROUND

The State alleged in its indictment that on January 24, 2023, Norman "intentionally and knowingly threaten[ed] Da'r[a]le Devon Barnes with imminent bodily injury" and "did then and there use or exhibit a deadly weapon, namely a tire iron or lug wrench during the commission of the assault." The State also alleged that Norman "knowingly possess[ed], with intent to deliver, a controlled substance, namely methamphetamine, in an amount of four grams or more but less than 200 grams."[1]

Barnes testified that he was working as a cashier at a Stripes convenience store in Edna, Texas, when Norman entered the store around midnight. Barnes said Norman went straight to the back of the store near the tools section and then started yelling at him to come help him look for something. Barnes was counting the cash in the register to place in the store's safe at the time. He told Norman to wait because he could not leave the cash unattended. Barnes said Norman responded with "F you" and then "came up towards [him]," "pulled out like a big wad of money," and said, "I can count all this money right here faster than you."

Barnes testified that after asking Norman to wait again, Norman said, "I am T. Norman [and] I will blast your ass," and "walked[ed] up towards [him] with a tire iron."

---

[1] The State also charged Norman with possession of a controlled substance in penalty group four but abandoned the charge before trial. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.118.

Barnes took "blast your ass" as meaning Norman would shoot him. Barnes agreed with the State that Norman's words, paired with an "aggressive[]" walk "with a tire iron in his hand," put him in fear of imminent bodily injury. Barnes said that after making the threats, Norman "turned around and took [] a few steps," at which point Barnes went into the storage room, locked the door, and called 911.

Barnes's 911 call was admitted into evidence. Barnes informed the 911 dispatcher that an African American male wearing a red hoodie, who identified himself as "T. Norman," was carrying "a tire iron" and "threatening to shoot [him]." Surveillance footage from the convenience store was also admitted into evidence. Three videos of the store's interior from different angles show Norman walking around the store. The videos contain no audio and do not show a continuous sequence of what occurred inside the store.

Barnes also testified that, about two months after Norman was arrested, he came into the store "three to four times" during his shift. Barnes said Norman did not speak to him. Later, Barnes said that a woman, allegedly on behalf of Norman, offered him $600 to $800 "to drop these charges," and he heard another woman was allegedly looking for him because "she want[ed him] to [] drop the charges."

Sergeant Ramirez of the Edna Police Department (EPD) was the first officer to arrive on scene. Upon arrival, he observed a small SUV, the only vehicle in the parking lot, by "the tire pressure pump." Sergeant Ramirez approached the vehicle and saw a "[B]lack gentleman wearing a red hoodie fitting the description of the person given by the victim." Sergeant Ramirez said he talked with Norman, who explained "his version of what happened with the clerk." Ramirez's body camera footage was admitted into evidence and played for the jury. In the video, Norman can be seen holding the tire tool and

3

explaining to Ramirez that he had a flat tire and went inside to ask the clerk if they had "anything to fix a tire." Norman said Barnes responded that he was "[expletive] counting the money," which Norman took offense to, and that Barnes then "just went back to the storage room."

As they talked, Ramirez noticed Norman was slurring his words and "swaying a little bit," and that "a very strong odor of marijuana [was] coming from the vehicle he said was his vehicle." Ramirez had Norman put the tire iron down so that he "could pat him down for weapons." During the pat-down, Ramirez felt "a baggy" in Norman's pocket that felt "like the baggies that are normally used to hold narcotics." After having Norman empty the contents of his pockets, Ramirez obtained a baggy that contained "a crystal-like substance," which later tested positive for methamphetamine. Ramirez also seized about $1,300 from Norman's person.

Ramirez then placed Norman under arrest. Deputy Jorge Franco of EPD arrived to assist Ramirez and spoke with a female sitting in the SUV passenger seat, who informed the officers that "nothing in the car belong[ed] to her." The officers conducted a search of the vehicle, and Ramirez testified that they discovered, among other things, a "substantial baggy of marijuana," drug paraphernalia, including a "pipe used for smoking methamphetamine," "scales, and possibly a grinder," "marijuana and methamphetamine in some cups," and "several small one-by-one baggies that are commonly used to distribute narcotics."

After the State rested, defense counsel attempted to proffer witnesses that would testify that Norman was going to use the seized cash to purchase a vehicle and asked the trial court to allow time for Norman's wife, mother, and his cousin to get to the

4

courthouse to testify. After some back and forth with the trial court, only Norman's wife, Patricia, testified. Patricia testified that she is a "social/emotional behavior specialist" at a high school in Victoria, which she said "entails working with the children who . . . have challenges behaviorally." Patricia said she has known Norman for eleven years and they had been married for four of those years. She testified that Norman was in the process of buying a second car and "was working overtime" to save up enough money, suggesting that was why Norman was out late and had a large amount of cash on hand at the time he was arrested.

Defense counsel also elicited testimony from Patricia about Norman's good character, including that Norman takes "his work very seriously," "he works a lot," "has excellent work ethic," is always on time to his job, and Norman's "employer valued him as an employee." Patricia stated that Norman has a history of drug abuse. Defense counsel then attempted to elicit evidence about Norman's struggle with addiction:

| | |
|---|---|
| [Defense]: | Now, at the beginning of this trial, I had asked the potential jurors if they believed that addiction was a disease or a dereliction of character. What is your opinion on that? |
| [The State]: | Objection, Your Honor. |
| | . . . . |
| THE COURT: | Objection sustained. |
| [Defense]: | Do you believe that using drugs is a dereliction of character? |
| [The State]: | Objection, Your Honor. Again, it goes to relevancy, or it is irrelevant. |
| THE COURT: | Sustained. |
| | . . . . |

5

| [Defense]: | [W]ith respect to his drug issues, his addiction, were you aware of when that started and how and why it started? |
|---|---|
| [Patricia]: | Yes, ma'am, yes. |
| [Defense]: | Can you share that with us? |
| [Patricia]: | Yes, ma'am. Why he started and how, I mean— |
| [The State]: | Objection, Your Honor. First is, that's not relevant. |
| THE COURT: | Sustained. |
| [Defense]: | There's a reason why Mr. Norman started doing drugs. Did he suffer trauma? |
| [Patricia]: | Yes, ma'am, as a child. |
| [The State]: | Your Honor, objection, still not relevant. . . . |

The court then admonished counsel not to ask "witnesses clear questions that have to do with character." Continuing the examination, counsel asked:

| [Defense]: | Are you aware that one of th[]e charges is [] assault with a deadly weapon? |
|---|---|
| [Patricia]: | Yes. |
| | . . . . |
| [Defense]: | That would suggest that he is a violent man, does it not? |
| [Patricia]: | The whatever does, yes [sic]. |
| [Defense]: | Has it ever been your experience in your time with this relationship that Mr. Norman has ever shown himself to have a propensity for violence? |
| [Patricia]: | No, he's never—like he has barely raised his voice at me. No, ma'am. I've never seen that. Very controlled. He can emotionally control himself. I've seen it time and time, again. |

6

| [Defense]: | And in his history, you've never known him to be charged with any violent offense? |
|---|---|
| [Patricia]: | No, no, ma'am. |

On cross-examination, the State elicited testimony that Patricia was convicted in 2011 "for having [a] fictitious or counterfeit [vehicle] inspection," and that Norman had a conviction for "unlawful possession of a firearm by a felon," "a felony conviction for possession of a controlled substance," and "several misdemeanor convictions." Additionally, the State asked if Patricia "married [Norman] in 2000 and divorced him in 2021." Patricia said yes, clarifying that they were currently in a common law marriage.

The jury found Norman guilty of the aforementioned offenses. During the punishment phase of trial, the State admitted evidence of Norman's numerous convictions for possession of a controlled substance ranging from 2004 to 2016, his convictions in 2007 and 2010 for driving while his license was suspended, and his convictions in 2018 for unlawful possession of a firearm by a felon and two counts of possession of a controlled substance. Defense counsel did not call any witnesses.

Norman was sentenced to ninety-nine years' imprisonment. Norman filed a motion for new trial and alleged ineffective assistance of counsel. His motion included an affidavit by his trial counsel, in which she stated that she strongly believed that she rendered ineffective assistance of counsel. The court denied the motion, and this appeal followed.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. Standard of Review & Applicable Law

The United States and Texas Constitutions guarantee a criminal defendant the right to reasonably effective assistance of counsel. U.S. CONST. amend. VI; TEX. CONST.

art. I, § 10; *see* TEX. CODE CRIM. PROC. ANN. art. 1.051; *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To obtain a reversal of a conviction on grounds of ineffective assistance of counsel, an appellant must show: (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding. *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009) (citing *Strickland*, 466 U.S. at 687). "Deficient performance means that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Ex parte Napper*, 322 S.W.3d 202, 246 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 687). "The prejudice prong of *Strickland* requires showing 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 248 (quoting *Strickland*, 466 U.S. at 694). "Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

The burden is on the appellant to prove ineffective assistance of counsel by a preponderance of the evidence. *Id.* The appellant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy. *See Strickland*, 466 U.S. at 689. "We commonly assume a strategic motive if any can be imagined and find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it." *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005).

**B.      Guilt/Innocence Stage**

Norman argues that he was denied his constitutional right to reasonably effective assistance of counsel because the totality of his trial counsel's performance was deficient. Specifically, Norman argues that counsel's "complete lack of an understanding of what the applicable law was is not sound trial strategy, and greatly . . . prejudiced [his] case."

Throughout trial, Norman's trial counsel mistakenly argued that the State had to prove that Barnes was physically harmed as an element of the charged offense.[2] For example, she continuously referred to the charge as "attempted" aggravated assault because no physical harm occurred, and she repeatedly asked Sergeant Ramirez if Barnes had been physically harmed. Counsel's mistake is evident from her objection to the jury charge after the State's closing argument:

| | |
|---|---|
| [Defense]: | Your Honor, I would like to point out that the definition of aggravated assault with a deadly weapon is not correct, and I would like for it to be changed and restated. It says—he cherry picked these words. He defined assault, not completely, and there's no definition of aggravated assault with a deadly weapon, and I think it's important that the jury knows that. |
| [The State]: | Your Honor, the jury charge indicates what aggravated assault is. A component of aggravated assault is during the course of committing assault there is exhibited or displayed a deadly weapon. I have correctly stated that the offense charge is aggravated assault with a deadly weapon, and the jury charge is correct. . . . |
| [Defense]: | Your Honor, it states clearly under [§ 22.02] that a person commits [aggravated assault] if the person |

---

[2] Relevant here, a person commits assault if the person intentionally or knowingly threatens another with imminent bodily injury, and a person commits aggravated assault if the person commits assault and the person uses or exhibits a deadly weapon during the commission of the assault. TEX. PENAL CODE ANN. §§ 22.01(a)(2), .02(a)(2). In this case, the jury charge included this definition of aggravated assault verbatim and instructed the jury to find Norman guilty of aggravated assault if it believed beyond a reasonable doubt that Norman "(1) intentionally and/or knowingly; (2) threatened Da'Rale Devon Barnes[] with imminent bodily injury; (3) and [Norman] used or exhibited a deadly weapon, namely a tire iron or lug wrench during the commission of that assault by threat."

9

> commits assault and the person causes seriously bodily injury to another. There is no verbiage at all about that. This is injunctive [sic], and it requires—it requires personal bodily injury or serious bodily injury to another.

[The State]: Your Honor, I am not sure if this is final argument or this is an objection to the jury charge that was read. The jury charge does conform with the law. I don't know what she's referencing, and my argument was based on the jury charge.

Even in her new trial affidavit, counsel remained convinced that the State was required to prove bodily injury. She explained:

> While my arguments were sound, the mechanics of a jury trial were beyond my experience and scope of knowledge. . . . I did not make an objection to the jury charge until it was too late. When I realized that there was a problem with the definition of aggravated assault with a deadly weapon, I immediately objected but was told by the judge that it was too late. I believe this mistake and lack of experience was most damaging because if the jury had the correct and full definition of the charge, aggravated assault with a deadly weapon, they would have realized that injury was required. However, despite the fact that no one was injured or physically threatened, [Norman] was found guilty on the aggravated assault with a deadly weapon charge and was sentenced to 99 years . . . .

Norman then points to a litany of alleged deficiencies in counsel's performance at the guilt/innocence stage.[3] He argues that counsel:

- [B]olstered the State's case when unsuccessfully asking Officer Ramirez whether Appellant was guilty and asking whether someone holding a tire iron was a threat to others.

- Opened the door to damaging testimony from Officer Ramirez about the cash found on Appellant being drug proceeds and other evidence of distribution of narcotics[, and] Officer Ramirez's unsubstantiated opinion that Appellant was making a trip "to Edna to resupply his stash and then return to Victoria to sell."

---

[3] Norman's trial counsel did not address any of these alleged deficiencies in her new trial affidavit.

- [C]laimed to have witnesses key to why Appellant had a large amount of cash on his person (was planning to buy a vehicle) but did not have them ready at court to testify.

- [D]id not know why she could not present character evidence at the guilt/innocense phase[.]

- Elicited testimony from [Patricia] that the charge itself "suggest[s] Appellant is a violent man [and opened the door to Patricia's prior conviction.]

- [D]id not know that objections to a jury charge must come at the charge conference, not after final arguments begin[.]

- [A]dmitted to failing to review [the Stripes security] videos prior to trial.

- [D]id not know that she could not present further argument after the State's rebuttal[.]

. . . .

- [Did not] know that the trial court imposes the jury's punishment verdict and decides whether those sentences are to be served concurrently or consecutively.[4]

We will assume without deciding that counsel's actions fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687; *Aldrich v. State*, 296 S.W.3d 225, 242, 251 (Tex. App.—Fort Worth 2009, pet. ref'd) (holding that counsel's continued misunderstanding of the law constituted deficient performance); *see also Tanner v. State*, No. 13-22-00099-CR, 2024 WL 193722, at *3–4 (Tex. App.—Corpus Christi–Edinburg Jan. 18, 2024, pet. granted) (mem. op., not designated for publication). We turn to whether counsel's deficient performance prejudiced Norman's defense,

---

4 Included in this bulleted list was Norman's contention that counsel "admitted to failing to review [the contents of the Stripes security videos] prior to trial." However, the record does not clearly show that counsel failed to review the security videos or discovery prior to trial. "To defeat the presumption of reasonable professional assistance, any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999) (quotation omitted). Therefore, we overrule this sub issue.

11

resulting in an unreliable or fundamentally unfair outcome of the proceeding. *See Strickland*, 466 U.S. at 687. We examine whether there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. *See id.* "When addressing the second step of *Strickland* we examine counsel's errors not as isolated incidents, but in the context of the overall record." *Ex parte Menchaca*, 854 S.W.2d 128, 132 (Tex. Crim. App. 1993). We consider "whether those specific deficient acts or omissions, in their totality, prejudiced the defense." *Ex parte Nailor*, 149 S.W.3d 125, 130 (Tex. Crim. App. 2004).

Norman's trial counsel challenged various legitimate aspects of the State's case in her opening and closing statements. She pointed to Norman's demeanor in Detective Ramirez's body camera footage, which she contended showed Norman was not "being threatening in any way." She argued that Barnes's "nonchalant" demeanor in his 911 call was inconsistent with someone who was being assaulted. She argued that the video surveillance footage from the Stripes convenience store "not once" showed Norman raise his hand with the tire iron and showed "very clear[ly] that [Norman] was not a threat to [Barnes]." She also emphasized that there was no audio to back up Barnes's testimony that Norman threatened him verbally. Particularly in her closing argument, counsel challenged Barnes's credibility and argued that a reasonable person would not feel threatened by a tire iron. She also argued that Norman did not have the requisite intent for aggravated assault, as evidence at trial showed he entered Stripes to fix a flat tire on his car.

In her cross-examination of Sergeant Ramirez, counsel challenged whether the officer believed Norman threatened Barnes based on Ramirez's statements in his body

12

camera footage. Counsel explored Ramirez's potential bias towards Barnes by questioning him on their personal relationship prior to the offense. Counsel also challenged Sergeant Ramirez's credibility by eliciting testimony that he had been "written up" twice in the past during his position as a jailer and had more than ten complaints by inmates. She challenged Ramirez about whether it would be unusual for someone to have a tire iron if they had a flat tire. She questioned Ramirez about whether Barnes would really be intimidated by a person with a smaller stature than him and elicited testimony that Barnes is over six feet tall. On both cross-examination and on recall, counsel challenged why Sergeant Ramirez did not collect the tire iron as evidence, suggesting that Ramirez did not believe there was any credible evidence of a threat. Finally, in her cross-examination of Barnes, counsel sought to discredit Barnes's testimony that he felt threatened by Norman.

Norman argues that, absent counsel's mistaken belief that "this was an allegation of aggravated assault by threat, not by injury, counsel could have presented a defense that the State's video evidence, missing the audio, was insufficient to [show that he] ever threatened the victim with imminent bodily injury." However, as stated above, counsel did challenge the State's video evidence and the "threat" element of assault. Additionally, we note that Barnes's sole testimony would have been enough to convict Norman of aggravated assault.[5] *See Bradley v. State*, 359 S.W.3d 912, 917 (Tex. App.—Houston

---

[5] Norman also argues that his trial counsel's mistaken belief that aggravated assault by threat requires physical injury "prevented him from making an informed and conscious choice regarding his right to a jury trial" because he "needed to know what the State had to prove for a guilty verdict." However, Norman does not show how counsel's inaccurate understanding of the elements of aggravated assault caused her to erroneously advise Norman about the benefits and risks of trial by jury, nor is there any indication in the record that Norman would have chosen a bench trial had he been advised differently. *See Ex parte Walker*, 794 S.W.2d 36, 36–37 (Tex. Crim. App. 1990) (holding that applicant was denied effective assistance of counsel because the record clearly showed his "choice to have the jury assess his

[14th Dist.] 2012, pet. ref'd) ("The testimony of a single eyewitness can be enough to support a conviction." (citing *Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971)).

Norman has failed to show by a preponderance of the evidence that his trial counsel's deficient performance so compromised the proper functioning of the adversarial process that the trial court cannot be said to have produced a reliable result. *See Strickland*, 466 U.S. at 686. Given the totality of counsel's performance—and the evidence at trial, including Barnes's and Sergeant Ramirez's testimony, and the controlled substances and drug paraphernalia obtained from Norman's car—we discern no reasonable probability that, but for counsel's deficient performance, the result of the guilt/innocence stage would have been different. *See Davis v. State*, 278 S.W.3d 346, 352–53 (Tex. Crim. App. 2009) (holding appellant did not meet the second prong of the *Strickland* test because "a significant amount of" evidence "tended to connect appellant to the offense committed, and the record reveals no rational basis on which the jury could have doubted or disregarded that evidence"). We overrule Norman's first issue.[6]

## C.    Punishment Stage

Lastly, Norman argues that he was denied his constitutional right to reasonably effective assistance of counsel because his trial counsel failed to present mitigation evidence at the punishment stage of trial. He first argues that the record shows counsel failed to understand when character evidence is permissible. Norman points to this

---

punishment" and such choice "was nullified by his attorney's" deficient performance). Accordingly, we overrule this sub-issue.

[6] We note that "claims of ineffective assistance of counsel are generally not successful on direct appeal and are more appropriately urged in a hearing on an application for a writ of habeas corpus." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011); *see Thompson v. State*, 9 S.W.3d 808, 814–15 (Tex. Crim. App. 1999) (noting that a habeas application would "provide an opportunity to conduct a dedicated hearing to consider the facts, circumstances, and rationale behind counsel's actions at . . . trial").

14

exchange, which occurred after the State rested and before the defense called any witnesses during the guilt/innocence stage of trial:

| | |
|---|---|
| [Defense]: | [I] would like to ask [Patricia] about [Norman's] personal life. |
| THE COURT: | Okay. That would not be appropriate in the guilt/innocence [stage]. |
| | . . . . |
| [Defense]: | Right. I am talking about before that, before the close, before we have our closing arguments. I was hoping to get his [wife] on the stand. |
| THE COURT: | Okay. But you're telling me that you want to put her on the stand as a character witness. |
| [Defense]: | Well, just, you know, she can give us some insight on who Mr. Norman is. |
| [The State]: | Okay. . . . does she have any personal knowledge as to the events in the store or what he had in the car, allegedly had in the car? |
| [Defense]: | Well, she does have personal knowledge that he was seeking to purchase a vehicle. She can testify to that. |
| | . . . . |
| [The State]: | But was she there that night? |
| [Defense]: | Well, she wasn't at the scene. |
| [The State]: | So[,] she has no personal knowledge. That was her vehicle that was registered to her. |
| [Defense]: | [I]t was her vehicle, so she can certainly speak to that. I believe that she does lend some credibility to Mr. Norman, just based on that. |
| [The State]: | You don't have to bolster his credibility, if he ha[s]n't testified. |
| THE COURT: | Yeah, that would not be appropriate. |

15

| [Defense]: | Okay. Well, I do want the jury to know who she is, and if that's the only way that they're going to get to know who she is, then— |
|---|---|
| | . . . . |
| THE COURT: | You want the jury to know who his wife is, and that's the purpose of her testifying? |
| [Defense]: | Well, I think, like I said, she lends credibility because the State is trying to paint my client to be something that he's not, and I believe that she can give testimony that can shed light on that. |
| [The State]: | Character testimony? |
| [Defense]: | Well, if it has to be done after he testifies, then we'll have him on the stand. |
| [The State]: | No, I didn't say that. I think character testimony would be for mitigation, and that would be the next phase of the trial, if I am understanding you correctly. |
| THE COURT: | And that's how I am understanding, too, so we're trying to get you to clarify. |
| [Defense]: | [Well,] I really don't know how to answer that. I am not seasoned like, you know, our prosecutor, but in my mind, my thinking, I believe that when a defendant is fighting for his freedom that he have the opportunity to bring people in that are going to help see him in a different light, not after he's found guilty. |
| THE COURT: | Well, that's when it's appropriate. |
| [Defense]: | —if he is found guilty. |
| THE COURT: | That's when it's appropriate in punishment. |
| [The State]: | Matters of mitigation are appropriate in the next phase, if we get to the next phase. |

Norman then argues that his trial counsel failed to call Norman's wife as a witness at punishment "when she was both available[] and had valuable information about

16

[Norman's] background to assist in mitigation." Norman argues that Patricia would have provided mitigating evidence about Norman's past childhood trauma and other "problems that led [him] down a drug-addicted path in life."

We first note that "[i]n a criminal case, a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecution may offer evidence to rebut it." TEX. R. EVID. 404(a)(2)(A); *see Melgar v. State*, 236 S.W.3d 302, 307 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) ("For example, in a prosecution for a crime of violence, the defendant's character for being peaceful is pertinent, because evidence of peaceful character makes it less likely that the defendant committed the crime."). Here, during the guilt/innocence phase, Norman's trial counsel successfully elicited character testimony from Patricia that Norman was a valued employee with a good work ethic, he did not have a propensity for violence, and he had never been convicted of a violent crime. *See Melgar*, 236 S.W.3d at 307.

However, the record before us indicates that counsel failed to elicit the mitigating testimony from Patricia as she intended. For example, counsel asked Patricia if she "believe[d] that using drugs is a dereliction of character," if she knew when Norman's "drug issues" started, and if she knew why Norman "started doing drugs." Patricia could not answer these questions because the State objected, and the court sustained the State's objections.[7]

Typically, "[t]he decision [of] whether to present witnesses is largely a matter of trial strategy." *Robinson v. State*, 514 S.W.3d 816, 824 (Tex. App.—Houston [1st Dist.]

---

[7] On appeal, Norman does not argue that the trial court erred by sustaining these objections, nor does he argue that the trial court erred in refusing to allow defense counsel to examine Patricia generally "about [Norman's] personal life" at the guilt/innocence stage.

2017, pet. ref'd). We can usually presume that "[a]n attorney's decision not to present particular witnesses at the punishment stage may be a strategically sound decision if the attorney bases it on a determination that the testimony of the witnesses may be harmful, rather than helpful to the defendant." *Id.* (quotations omitted); *see also Arthur v. State*, No. 13-18-00168-CR, 2019 WL 6906560, at *3 (Tex. App.—Corpus Christi–Edinburg Dec. 19, 2019, no pet.) (mem. op., not designated for publication) ("Because we do not have a record of counsel's strategy for calling these witnesses during the punishment phase, we will only find his decision deficient if it was so outrageous that no competent attorney would have engaged in it."). In this case, however, we cannot presume that trial counsel reasonably excluded Patricia's testimony because the unfavorable counter-testimony from the State had already been introduced, and the record shows counsel intended Patricia to testify to Norman's good character. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1) (providing that any evidence relevant to sentencing, including the defendant's "general reputation, his character, [and] an opinion regarding his character," is admissible during punishment); *Robinson*, 514 S.W.3d at 824.

The record also shows that Norman's defense counsel admitted multiple times throughout trial that she was not a "seasoned" attorney, and during her closing argument she admitted to the jury that she "made mistakes." In her new trial affidavit, she admitted that "the mechanics of a jury trial were beyond [her] experience and scope of knowledge." *See Shanklin v. State*, 190 S.W.3d 154, 164 (Tex. App.—Houston [1st Dist.] 2005, pet. granted) (finding that appellant's trial counsel was deficient because his counsel submitted an affidavit in his motion for new trial that stated his conduct "was not the result of any reasoned trial strategy"); *see generally Strickland*, 466 U.S. at 688

18

("Representation of a criminal defendant entails certain basic duties" including "a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process").

We can conceive of no reasonable trial strategy for trial counsel's failure to recall Patricia for the punishment stage of trial. *See Strickland*, 466 U.S. at 687; *Andrews*, 159 S.W.3d at 102 ("[W]hen no reasonable trial strategy could justify the trial counsel's conduct, counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects the trial counsel's subjective reasons for acting as she did."). Patricia was available to testify. She would have introduced evidence relevant to mitigation that necessarily differed from her testimony during the guilt/innocence phase, as evidenced by the fact that counsel unsuccessfully attempted to elicit character evidence from Patricia to help the jury "see [Norman] in a new light." *See Shanklin*, 190 S.W.3d at 164; *cf. Lampkin v. State*, 470 S.W.3d 876, 924 (Tex. App.—Texarkana 2015, pet. ref'd) (finding appellant's mental health records, which showed that appellant had, among other things, "a long history of drug abuse," could have mitigated the jury's sentence during the punishment phase of trial if they had been properly admitted). We hold that counsel's performance in this regard fell below an objective standard of reasonableness, and Norman has satisfied the first *Strickland* prong.

As previously stated, the second *Strickland* prong is established if there is a reasonable probability that, but for counsel's deficiency, the outcome would have been different. *See Strickland*, 466 U.S. at 687; *Rivera v. State*, 123 S.W.3d 21, 28 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (providing that the *Strickland* analysis applies to the

19

punishment phase as well as to the trial stage of criminal proceedings). To determine whether Norman has established the second *Strickland* prong, we look to the following non-exclusive list of factors: "(1) whether the defendant received a maximum sentence, (2) the disparity, if any, between the sentence imposed and the sentence(s) requested by the respective parties, (3) the nature of the offense charged and the strength of the evidence presented at the guilt/innocence phase of trial, (4) the egregiousness of counsel's error—essentially, the relationship between the amount of effort and resources necessary to have prevented the error as compared to the potential harm from that error— and (5) the defendant's criminal history." *Lampkin*, 470 S.W.3d at 922; *see Shanklin*, 190 S.W.3d at 165 (balancing similar factors in the court's *Strickland* analysis).

At punishment, the State provided evidence of Norman's past criminal convictions, and the defense called no witnesses. The State recommended that the jury sentence Norman to twenty years as to the aggravated assault charge, and sixty years as to the manufacture/delivery offense. Defense counsel made no sentencing recommendation and her closing argument during punishment was one sentence: "Like I stated earlier, I would just ask that you please take into consideration the time and ask for your mercy." For both charges, the jury assessed punishment at ninety-nine years' imprisonment and the maximum fine against Norman. Norman had prior convictions for possession of a controlled substance, but he had no prior convictions for the manufacture or delivery of a controlled substance or any violent offenses. *See Milburn v. State*, 15 S.W.3d 267, 270– 71 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (finding appellant demonstrated prejudice because, among other reasons, his trial counsel "presented no evidence of

mitigation" during punishment, and "the jury, hearing no favorable character or otherwise mitigating evidence, returned a sentence in excess of that requested by the State").

We agree with Norman that, had Patricia testified during punishment, it is reasonably possible that the jury would not have sentenced him to the maximum sentence of ninety-nine years' imprisonment. *See Shanklin*, 190 S.W.3d at 165–66 (holding that appellant demonstrated prejudice because his counsel failed to call any favorable witnesses during punishment "despite knowing that [they] were available to testify"); *Milburn*, 15 S.W.3d at 270–71; *cf. Lampkin*, 470 S.W.3d at 924. Norman's second issue is sustained.

### III. CONCLUSION

We affirm the trial court's judgment on defendant's guilt but reverse the trial court's judgment as to punishment and remand the case to the trial court for a new trial on punishment only.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
15th day of August, 2024.

21